Dr. James M. ERICKSON, ex rel. UNITED STATES of America, Plaintiffs,

v.

AMERICAN INSTITUTE OF BIOLOGICAL SCIENCES, Defendant.

Civ. A. No. 88–1022–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 7, 1989.

---

Charles G. Aschmann, Jr., Alexandria, Va., for Erickson.

Paula P. Newett, Asst. U.S. Atty., and Robert Salcido, Civil Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Alan H. Yamamoto, Fairfax, Va., for American Institute of Biological Sciences.

## MEMORANDUM OPINION

ELLIS, District Judge.

### INTRODUCTION

This is a *qui tam* action.[1] It is brought by a government employee who claims to be an "independent source" of evidence proving that the defendant submitted false claims to a government agency in violation of 31 U.S.C. § 3729 (1986). Because the relator, as *qui tam* plaintiffs are called, is a government employee and because a pre-existing *qui tam* suit brought by another relator (this defendant) involves, in part, the same subject matter, this action raises novel and important questions concerning the recently revised federal *qui tam* statute, 31 U.S.C. § 3730 (1986). Also raised is a question concerning failure to comply with the statute's filing and service requirements. Specifically, the questions presented are:

(1) Must this action be dismissed because the Complaint was not filed and maintained under seal for at least 60 days nor was service on defendant postponed until ordered by the court, all in contravention of 31 U.S.C. § 3730(b)(2)?

(2) Can a government employee maintain a *qui tam* action based on information learned in the course of his or her employment?

(3) Does a pre-existing *qui tam* action by another relator bar this suit where it is based, in part, on the same allegations?

The first two of these questions originally came before the Court on defendant's motion to dismiss. While the motion was pending, the United States sought a 60 day extension of time to consider whether to intervene and assume the prosecution of the suit as permitted by 31 U.S.C. § 3730(b)(3) and (4).[2] The Court granted

---

**1.** "Qui tam" means "who as much as." The phrase is taken from the longer Latin expression "qui tam pro domino rege quam pro se ipso in hac parte sequitur," meaning "who brings the action for the king as well as for himself." *See* W. Blackstone, *Commentaries on the Law of England* 160 (1768).

A *qui tam* action "is an action brought by an informer under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state or some other institution...." *State ex rel. Rodes v. Warner*, 197 Mo. 650, 94 S.W. 962, 965 (1906) (quoting *Black's Law Dictionary*); *see also Williams v. Wells Fargo & Co.*, 177 F. 352 (8th Cir.1910) (A *qui tam* action is an action to recover a penalty brought by an informer pursuant to statute where one portion of the recovery goes to the informer and the other portion to the state);

*United States ex rel. Rodriquez v. Weekly Publications*, 74 F.Supp. 763, 765 (S.D.N.Y.1947).

**2.** Subsections 3730(b)(3) and (4) provide as follows:

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

(A) proceed with the action, in which case the action shall be conducted by the Government; or

the United States' request for additional time, rejected defendant's challenge based on improper filing and service of the complaint, and postponed question No. 2 above as it might have been mooted, at least in part, had the government chosen to intervene.

Ultimately, the government chose not to intervene and assume prosecution of the suit. Following this, defendant renewed its motion to dismiss on all grounds, including the charge of improper filing and service of the complaint. At oral argument on defendant's motion, the government, with leave of Court, filed a brief *amicus curiae*, arguing that the legislative history of the federal *qui tam* statute shows that government employees may not bring *qui tam* actions. The government also raised for the first time whether a prior *qui tam* action barred plaintiff's suit. At the conclusion of the argument, the Court again rejected the attack based on the service and filing of the complaint, gave plaintiff leave to file a response to the government's brief and took the remaining matters under advisement. Since then, the Court, *sua sponte*, has concluded that its previous ruling on the service and filing of the complaint should be vacated and the issue reconsidered. Accordingly, defendant's motion to dismiss, presenting the three potentially dispositive questions set forth here, is now ripe for decision.

The Court concludes, on the basis of all the briefs and arguments, that the motion to dismiss should be granted on the ground that the relator failed to comply with the *qui tam* statute's mandatory filing and service requirements. Although this ruling is dispositive, the Court, in the interests of judicial economy, sets forth here its views on the remaining questions in the event the matter is appealed. As to the second question presented, review of the language, structure and history of the *qui tam* statute points persuasively to the conclusion that Congress, in its 1986 amendments, did not intend a blanket exclusion of government employees from the scope of the *qui tam* statute. Rather, Congress chose to exclude from the class of permissible *qui tam* relators only limited groups of persons in certain, defined circumstances. None of the exclusions applies here. Indeed, the fourth exclusion indicates that *qui tam* suits may be brought by plaintiffs who are "original source[s]." *See* 31 U.S.C. § 3730(e)(4)(B). Where, as here, the relator appears to fit the definition of "an original source", threshold dismissal is unwarranted. But threshold dismissal of some portions of this action would be required in response to the last question. The *qui tam* statute requires dismissal of those portions of the instant action that are based on facts underlying the pre-existing *qui tam* action brought by another relator.

## FACTUAL BACKGROUND

Relator, Dr. James Erickson, is an employee of the Agency for International Development ("AID"), an agency of the Department of State. He is currently on leave with pay.[3] From March 1982 until April 1987, Erickson served as the Cognizant Technical Officer (CTO) for the AID Malaria Project, a project aimed at producing a vaccine for malaria. In connection with this project, AID had contracted with defendant, American Institute of Biological Science (AIBS).[4] As CTO for the project, Erickson was responsible for ensuring that the AID–AIBS contract was properly administered. His approval was also required to authorize AID payment of AIBS's expense vouchers. In the course of the project, AIBS subcontracted for the servic-

(B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

**3.** Erickson was placed on leave with pay based on allegations of sexual harassment unrelated to the questions presented in this dispute. The charges were dropped in September 1988, but Erickson remains on leave with pay.

**4.** AIBS is a private, non-profit organization. It was chartered pursuant to 36 U.S.C. § 251 and Executive Order No. 2859 to stimulate research in the biological sciences. In the course of performing its functions, AIBS receives contracts and grants from numerous federal agencies.

es of Dr. Espinal of the Instituto Nacional de Salud (INS) in Bogota, Colombia. As part of his CTO duties, Erickson had occasion to review claims made by Espinal and INS to AIBS.

The Complaint alleges that while serving as CTO on the contract, Erickson personally accumulated evidence documenting areas of contract non-performance and misconduct on the part of AIBS. Specifically, Erickson alleges he discovered evidence of the following:

(1) diversion of AIBS checks payable to the Malaria Immunology Unit of INS in Bogota to numbered Swiss bank accounts during 1982–84;

(2) payments of salaries or bonuses to INS employees that were not authorized by the INS Board;

(3) nationalization of scientific equipment by the Government of Columbia under its subcontract with AIBS in violation of the contract provisions regarding ownership of capital equipment. AIBS assisted in this process by paying the legal and administrative costs of the nationalization;

(4) use of Malaria Project funds to pay for AIBS employees' personal entertainment and travel expenses;

(5) use of Malaria Project funds to pay expenses for a conference held in France; and

(6) AIBS entering into subcontracts involving the Malaria Project without receiving prior approval from AID.

In December 1986 Erickson reported these alleged contract violations and misconduct to his direct supervisor and to the AID procurement office. In March 1987, Erickson submitted a written evidence report outlining allegations of impropriety to his superiors and to the AID Procurement Office. Over the following months Erickson continued his investigation and supplied the AID with additional evidence of alleged AIBS misconduct. On February 22, 1988, apparently after an investigation, AID notified AIBS that all collection obligations and program requirements had been met and were fully acceptable. In other words, AID would not pursue the matter.

In 1986, Dr. Espinal had filed suit in the U.S. District Court for the District of Columbia against AIBS for breach of contract. On February 26, 1988, shortly after AID indicated it would not pursue the AIBS matter, AIBS asserted a *qui tam* counterclaim against Espinal. In that counterclaim, AIBS alleged that Espinal submitted false claims to AIBS for bonus or supplemental payments to himself and other INS employees in the amount of $147,000.

## ANALYSIS

### A. Compliance with Qui Tam Filing and Service Requirements

■ Qui tam relators must comply with mandatory filing and service requirements. Specifically, the statute provides that the *qui tam* complaint *"shall* be filed in camera, *shall* remain under seal for at least 60 days, and *shall* not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2) (emphasis added). Erickson failed to comply with these statutory requirements. Instead, he followed the pre–1986 *qui tam* filing and service procedures. These procedures did not include an *in camera* filing requirement. Instead, only the normal federal rules procedures plus service of the complaint on the government were required. *See* 31 U.S.C. § 3730(b)(2) (1983). Ericksons's failure to comply with the procedural requirements added by Congress in 1986 warrants dismissal of this action.

In general, a party pursuing a statutory remedy must comply with all the procedures the statute mandates. As the Supreme Court put it in *United States ex rel. Texas Portland Cement Co. v. McCord,* 233 U.S. 157, 162, 34 S.Ct. 550, 552, 58 L.Ed. 893 (1913), if a statute "creates a new liability and gives a special remedy for it, ... upon well-settled principles the limitations upon such liability become a part of the right conferred, and compliance with them is made essential to the assertion and benefit of the liability itself." In *McCord,* plaintiff's failure to comply with a proce-

dural requirement that suit be delayed for six months after the completion of a public construction project to give the government an opportunity to intervene proved fatal to its claim under the Heard Act. 33 Stat. 811 (1905) (repealed 1935).[5] The same principle was applied by the Second Circuit in *Reich v. Dow Badische Co.*, 575 F.2d 363 (2d Cir.1978). There, plaintiff's failure to comply with statutory notice and filing requirements terminated his right to bring suit under the Age Discrimination in Employment Act.[6] The procedural requirements in *McCord* and *Reich* are completely analogous to *qui tam* statute's filing and service requirements. It follows that dismissal is warranted here.

Sound policy also supports dismissal. Erickson's failure to comply with the filing and service provisions irreversibly frustrates the congressional goals underlying those provisions. They were adopted primarily to allow the government first to ascertain in private whether it was already investigating the claims stated in the suit and then to consider whether it wished to intervene. S.Rep. No. 345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5289. The provisions were also designed to prevent alleged wrongdoers from being tipped off that they were under investigation. *Id.* As secondary goals, Congress intended the new procedural requirements to rectify a statutory anomaly "under which the defendant may be forced to answer the complaint two days after being served, without knowing whether his opponent will be a private litigant or the Federal government" and to protect the defendant's reputation from unfounded public accusations. *Id.* Erickson's failure to file the complaint *in cam-*

era and to delay service on the defendant frustrated Congress' primary and secondary goals. And, significantly, this result cannot be cured or remedied. Courts apparently draw a sensible distinction between cases in which filing and service errors can be cured and those in which they cannot. In the former cases, courts typically give delinquent parties the opportunity to correct their mistakes.[7] Where, as here, no cure exists, dismissal is the proper remedy. To hold otherwise renders the *qui tam* filing and service requirements toothless.

### B. *Government Employees as Qui Tam Plaintiffs*

■ The current *qui tam* statute does not directly address whether government employees may maintain *qui tam* actions. Thus, the answer to this question must be sought indirectly through the statute's structure, history and purpose. Such an inquiry makes clear that there is no blanket exclusion of government employees as potential *qui tam* relators.

Structure is especially illuminating. In defining the classes of persons eligible to bring *qui tam* actions, Congress had a choice: It could have chosen to make eligible as *qui tam* relators only certain defined groups of persons and exclude all others or it could have chosen to include all persons as eligible *qui tam* relators with certain specific exceptions. It chose the latter scheme. The statute first permits any "person" to bring a *qui tam* action, and then specifically excludes four groups. Thus, 31 U.S.C. § 3730(b) and (e) provide as follows:

---

**5.** The Heard Act was the statutory predecessor to the Miller Act, 40 U.S.C. §§ 270a, 270b, providing aggrieved government contractors with a statutory right of action.

**6.** The Age Discrimination in Employment Act bars suits by a grievant until sixty days after he has presented his charge of discrimination to the appropriate state employment protection agency and further requires that a grievant must file notice of his intention to sue with the Secretary of Labor. 29 U.S.C. §§ 633(b) & 626(d).

**7.** *See, e.g., Aetna Casualty & Surety Co. v. Circle Equipment Co.*, 377 F.2d 160 (D.C.Cir.1967) (plaintiff's error in filing suit before six month pre-filing period had elapsed was mooted by defendant's failure to move for dismissal within the pre-filing period); *Video Engineering Co. v. Foto–Video Electronics, Inc.*, 207 Va. 1027, 154 S.E.2d 7 (1967) (dismissal unwarranted when following filing of suit plaintiff complied with domestication statute by obtaining certificate of authority to do business).

(b) **Actions by private persons.**—(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

\* \* \* \* \* \*

(e) **Certain actions barred.**—(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

(2)(A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought

(B) For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in section 201(f) of the Ethics in Government Act of 1978 (5 U.S.C.App.).

(3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

The inference invited by Congress' choice on structure is compelling: Government employees are included in the general universe of permissible *qui tam* plaintiffs unless, in the particular circumstances, they fall into one of the four specifically defined excluded groups.[8]

The conclusion that there is no blanket exclusion of government employees finds support in the nature of the exclusions themselves. Thus, the first exclusion, by its terms, bars only *qui tam* actions brought by members of the armed forces against *other* armed forces members. 31 U.S.C. § 3730(e)(1). This provision is pregnant with the implication that armed forces members may bring *qui tam* suits against non-members of the armed forces.[9]  As

---

**8.** *See Matter of Cash Currency Exchange, Inc.,* 762 F.2d 542, 552 (7th Cir.1985), *cert. denied sub nom,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985) ("The general rule of statutory construction is that the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically included.") (quoting 2A *Sutherland Statutory Construction* § 47.23 (1973 & Supp.1983)); *Midland Telecasting Co. v. Midessa Television Co.,* 617 F.2d 1141 (5th Cir.1980), *cert. denied,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).

**9.** The government argues that the armed forces exclusion was meant to protect military person-nel from *qui tam* suits by other military personnel based on information the soldier-relator learned *outside* the scope of his employment. (Supplemental Brief of United States as *Amicus Curiae* at 9—10). This argument is unpersuasive. The plain language refutes this; it bars more than merely suits by relators based on information learned outside the scope of their employment. The exclusion blocks all *qui tam* suits between military personnel where the suit arises out of the defendant's "service in the armed forces." 31 U.S.C. § 3730(e)(1). The exclusion does not even mention information learned outside the scope of the soldier-relator's employment.

such, this exclusion is a strong indication that Congress did not intend a blanket exclusion of government employees as *qui tam* plaintiffs. So, too, is the second exclusion. It precludes *qui tam* actions against Members of Congress, judges and senior members of the executive branch "if the action is based on evidence or information known to the Government when the action was brought." 31 U.S.C. § 3730(e)(2)(A). As it is based on the government's knowledge,[10] it effectively precludes government employees from bringing *qui tam* suits against members of Congress, judges or certain senior executive branch personnel. But again, the necessary implication is that government employees, absent the application of another exclusion, may bring *qui tam* actions against defendants other than members of Congress, judges and senior members of the executive branch.

Yet additional evidence that government employees may bring *qui tam* actions is provided by the statute's 1986 whistleblower provision. It states that "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against ... because of lawful acts done by an employee ... in furtherance of an action under [the *qui tam* statute] ... shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h) (1986). Congress also made clear its intention that the terms "employee" and "employer" should be broadly construed and "should be all

inclusive," with employers including "public as well as private sector entities." S.Rep. No. 345, at 34–5, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5299–300. Congress, therefore, considered it necessary to confer whistleblower protection on government employees.[11] Such protection would be unnecessary and inappropriate unless, as seems quite apparent, Congress also intended to include government employees within the universe of eligible *qui tam* relators.

Nor is Erickson's suit barred by any of the four exclusions. Erickson is not "a former or present member of the armed forces." 31 U.S.C. § 3730(e)(1). Nor is the defendant here a "Member of Congress, ... the judiciary, or a senior executive branch official." 31 U.S.C. § 3730(e)(2). Hence the first two statutory exclusions plainly do not apply to Erickson or this suit. Neither does the third; the instant action is not "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). Finally, the fourth exclusion is also no bar here because Erickson, at this stage of the record, appears to be an "original source;" he appears to have "separate and independent knowledge of the information on which the allegations are based" and voluntarily furnished the information to the government before any investigation was commenced or suit brought. 31 U.S.C.

---

**10.** The language used in this 1986 limited exclusion—"based on information the Government had when the action was brought"—is identical to the language Congress used in the 1943 Act to exclude all government employee *qui tam* actions. 31 U.S.C. § 3730(b)(4) (1983). Therefore, Congress, in the 1986 revision, chose to restrict this language to one of the four limited exclusions rather than to the statute as a whole. This buttresses further the conclusion that the 1986 revisions discarded the 1943 blanket exclusion of government employees as *qui tam* relators.

**11.** Indeed, the legislative history is replete with discussions of problems government employees face as whistleblowers. For example, the Judiciary Committee report provides the following discussion of a report on government whistleblowers:

In 1983, the U.S. Merit Systems Protection Board conducted a survey of approximately 5,000 Federal Government employees to determine to what extent observed fraud, waste and abuse was going unreported. The Merit Systems Board reported that 69 percent of those who believed they had direct knowledge of illegalities failed to report the information. Those employees who chose not to report fraud were then asked why they had failed to come forward. The more frequently cited reason given (53 percent) was the belief that nothing would be done to correct the activity even if reported. Fear or reprisal was the second most cited reason (37 percent) for nonreporting.

S.Rep. No. 345, 99th Cong., 2d Sess. 4–5, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5269–70.

§ 3730(e)(4). Indeed, Erickson's allegations were apparently the source and stimulus for a governmental investigation.[12]

If the statute's structure and various provisions point convincingly away from a blanket government employee exclusion and toward permitting government employee *qui tam* suits, the legislative history does no less. *Qui tam* actions are well established fixtures in the Anglo American legal tradition. The First Congress made use of the concept in several statutes.[13] In this context, its use dates from 1863 when, at the request of President Lincoln, Congress passed the "False Claims Act" and included a *qui tam* provision to combat profiteering by Union Army suppliers during the Civil War. *See* Act of March 2, 1863, c. 67 12 Stat. 696. Section 6 of the original False Claims Act authorized the various District Attorneys (predecessors to the United States Attorneys) to bring suits under the Act. It also granted private persons ("relators") the privilege of bringing suits under the Act and promised these persons a share of the damages as an incentive. The purpose of the *qui tam* provision, then as now, was to aid in the effort to root out fraud against the government.[14] To this end, it is well established the original False Claims Act permitted *qui tam* actions to be brought by government employees as well as private citizens.

This continued to be the case for 80 years.[15] In 1943, it changed; the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), prompted Congress to revise the provisions of the original 1863 *qui tam* provisions of the False Claims Act. *Marcus* involved an action by a relator who, it was alleged, merely copied a federal criminal indictment. The government argued that the informer's *qui tam* action should be barred because he brought no information of his own to the suit. It was the government's view that payment of any portion of damages to the relator in these circumstances would be contrary to the purpose or spirit of the False Claims Act. The government also argued that

---

**12.** AIBS argues that the caption of 31 U.S.C. § 3730(b), "Actions by private persons," demonstrates that government employees were to be excluded from the universe of potential *qui tam* relators. This argument is unpersuasive. The "private person" caption in subsection (b) was not meant to exclude suits by government employees. Rather, it was meant to contrast with the caption in subsection (a)—"Responsibilities of the attorney general." 31 U.S.C. § 3730(a). Simply put, "actions by private persons" only refers to actions other than those initiated by the government.

In any event, it would violate accepted canons of statutory construction to use this caption to contradict the clear implication of the statute's text. *See Scarborough v. Office of Personnel Management*, 723 F.2d 801, 811 (11th Cir.1984) (captions may not be used to limit the clear meaning of a statute); *Mohegan Tribe v. State of Connecticut*, 638 F.2d 612, 620 (2d Cir.1980), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981) (title of Act cannot contradict more specific language contained in body of Act). Here, the *qui tam* statute's text, structure and history compel rejection of AIBS' argument that the "private persons" caption was meant to bar *qui tam* suits by government employees.

**13.** The First Congress allowed *qui tam* actions in connection with at least ten of its early penal statutes. For a detailed description of the role of *qui tam* provisions in early American law, see *United States ex rel. Stillwell v. Hughes Helicopters, Inc.*, 714 F.Supp. 1084 (C.D.Cal.1989).

**14.** This is underscored by the following statements made in Congress at the time of the Act's passage. For example, Senator Wilson stated:

these Halls have rung with denunciations of the frauds of contractors upon the Government of the United States. Investigating committees in both Houses of Congress have reported the grossest frauds upon the Government.

Cong. Globe 37th Cong., 3rd Sess. 956 (1893). In the same vein, Senator Howard, sponsor of the Act, stated that:

I will simply say to the Senate that this bill has been prepared at the urgent solicitation of the officers who are connected with the administration of the War Department and Treasury Department. The country, as we know, has been full of complaints respecting the frauds and corruptions practiced in obtaining pay from the Government during the present war.

*Id.* at 952.

**15.** In 1873, the 1863 Act was recodified. *See* Title 36, Rev.Stat. §§ 3490–3494 (18 Stat. 695–95, Part 1) (1873). This recodification barred *qui tam* suits brought against military personnel. *Id.*, Rev.Stat. § 3490. In all other substantive respects, the *qui tam* provisions were identical to those adopted in 1863.

permitting such suits raised the specter of unseemly races to the courthouse between private parties and government and infringed on the Attorney General's control over civil and criminal cases for fraud against the government. For these reasons, the government urged the Supreme Court to construe the 1863 *qui tam* provisions to preclude such suits. The Court rejected the government's position, holding that the 1863 Act did not require the relator to be an independent source, nor did the Attorney General have exclusive control over civil cases for fraud against the government. The Court's *Marcus* decision invited the government to seek from Congress the result it did not win in the Court. *Id.* at 547, 63 S.Ct. at 385–386.

Then Attorney General Biddle accepted the invitation and called on Congress to enact remedial legislation to ensure that "whenever a grand jury returns an indictment charging fraud against the government" there would be no "scramble among would-be informers to see who could be first to file a civil suit based on the charges in the indictment." [16] The House's initial response was to repeal the *qui tam* provisions *in toto*. 89 Cong.Rec. 2801 (1943). The Senate's response was less drastic; it proposed legislation by which an "honest informer," who contributed original information to the government, could continue to maintain *qui tam* suits, thereby foreclosing the copy-cat suits.[17] The proposed Senate bill created a jurisdictional bar to *qui tam* suits unless the relator's allegations were "based upon information, evidence, and sources original with such per-

son and not in the possession of or obtained by the United States in the course of any investigation or proceeding instituted or conducted by it." 89 Cong.Rec. 10744 (1943). The Conference Committee significantly altered the Senate bill but followed the Senate's lead in retaining a jurisdictional bar. The Conference bill provided that:

> [t]he court shall have no jurisdiction to proceed with any [*qui tam*] action ... whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States or any agency, officer or employee thereof, at the time such suit was brought.

89 Cong.Rec. 10844 (1943). Thus, the Conference bill deleted the Senate's original source exception and instead precluded jurisdiction where the suit was based on evidence or information in the possession of the United States or any of its employees at the time of the suit. This provision blocked *qui tam* suits by government employees, a result plainly intended by Congress in 1943.[18] The Conference Committee bill was ultimately passed and signed without further revision.[19] After 1943, therefore, it was plain that government employees could not bring *qui tam* suits under the False Claims Act.

Over the next four decades, the 1943 revision of the *qui tam* statute led, not surprisingly, to a substantial decline in the use of the *qui tam* provision to combat fraud against the government. Contributing to the decline were restrictive judicial interpretations of the Act's burden of proof standards and the "apparent inequities im-

---

**16.** *See* 89 Cong.Rec. 7571 (1943) (quoting Letter of Attorney General Biddle to Senator Van Nuys, Chairman of the Judiciary Committee); H.R.Rep. No. 263, 78th Cong., 1st Sess. 2 (1943) (Letter of Attorney General to House Speaker).

**17.** As Senator Van Nuys put it, the Judiciary Committee "tried to protect bona fide, honest informers," only excluding those relators whose allegations were not "based upon information, evidence, and sources original with such person and not in the possession of or obtained by the United States in the course of an investigation or proceeding instituted or conducted by it." 89 Cong.Rec. 7572 (1943).

**18.** The Congress feared that allowing government employees to bring *qui tam* suits would lead to these employees investigating fraud claims with an eye towards personal remuneration rather than performing their jobs as required by law. Congress was also concerned that government employees would attempt to circumvent the restriction against government employee serving as *qui tam* relators by providing information to their friends. *See* 89 Cong. Rec. 10846 & 10849 (1943). The 1943 revision was designed to prevent both forms of abuse.

**19.** *See* 89 Cong.Rec. 10775 (1943) (House vote); 89 Cong.Rec. 10849 (1943) (Senate vote); and 89 Cong.Rec. 11005 (1943).

posed on private citizens by the statute's *qui tam* jurisdictional bar [on *qui tam* suits based on information already known by the government]." *United States ex rel. LaValley v. First Nat. Bank of Boston,* 707 F.Supp. 1351, 1355 (D.Mass.1988) (citing S.Rep. No. 345, 99th Cong., 2d Sess. 4, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5299). One of these restrictive judicial interpretations, *United States ex rel. State of Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir.1984), was sharply criticized for limiting the scope of the *qui tam* provisions for no good reason. S.Rep. No. 345, 99th Cong., 2d Sess. 13–14, *reprinted in* 1986 U.S.Code Cong. & Admin. News 5278–79.

*Dean* and the criticism it provoked stimulated calls for revisions of the statute's *qui tam* provision. Specifically, the National Association of Attorneys General called on Congress to amend the Act to "rectify the unfortunate result of the ... *Dean* decision." S.Rep. No. 345, 99th Cong., 2d Sess. 13, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5278. Responding to critics, Congress, in 1986, once more amended the *qui tam* provisions of the False Claims Act.[20] Congressional intent was clear: it sought to expand the *qui tam* provisions to "encourage more private enforcement suits." S.Rep. No. 345, 99th Cong., 2d Sess. 23–24, *reprinted in* 1986 U.S.Code

Cong. & Admin.News 5288–89. The need for encouraging private enforcement was equally clear: government enforcement of anti-fraud provisions was viewed as inadequate.[21] The language initially adopted by the Senate barred suits based on information in the government's possession or publicized by the media unless the relator was the "original source" of the information to the "entity that disclosed the allegation." 132 Cong.Rec. S11244 (1986). In addition, the Senate added language protecting whistleblowers, increased the benefits for relators, and specifically proscribed actions brought by or against certain classes of government employees. On October 3, 1986, the Senate limited the application of the original source exception to those cases in which there had been prior disclosure of the allegations to the government. On October 27, 1986, the 1986 Amendment to the Act was signed into law.[22]

To summarize, then, from 1863 to 1943, Congress placed no restrictions on the class of plaintiffs entitled to bring *qui tam* actions under the False Claims Act. During this period, many persons, including government employees, brought such suits. Indeed, as *Marcus* reflects, relators often sought to avail themselves of *qui tam* benefits by doing no more than copying the allegations of an indictment or pirating material from a government report or investi-

---

**20.** Recodification of the 1943 *qui tam* provisions occurred in 1982. While some awkward language was revised, Congress intended that the recodification effect no substantial changes. *See* H.R.Rep. No. 97–651, 97th Cong., 2d Sess. 3, *reprinted in* 1982 U.S.Code Cong. & Admin. News 1895–96.

**21.** As the Senate report put it:
[f]raud is perhaps so persuasive and, therefore, costly to the Government due to a lack of deterrence. [The Government Accounting Office] concluded in its 1981 study that most fraud goes undetected due to the failure of Governmental agencies to effectively ensure accountability on the part of program recipients and Government contractors. The study states:
For those who are caught committing fraud, the chances of being prosecuted and eventually going to jail are slim.... The sad truth is that crime against the Government often *does* pay.
S.Rep. No. 345, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5268

(quoting GAO Report to Congress, *Fraud in Government Programs: How Extensive is it? How Can it be Controlled?* (1981) (on cover)).
Congress was particularly critical of the enforcement job done by the Department of Justice, noting that "Department of Justice records show that most fraud referrals remain unprosecuted and lost public funds, therefore, remain uncollected." S.Rep. No. 345, 99th Cong., 2d Sess. 4, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5269. As Congressman Glickman put it, "[f]rankly, whether as a result of a lack of resources or worse, the Department of Justice has not done an acceptable job of prosecuting defense contractor fraud." Cong.Rec. H6482 (1986).

**22.** For a more complete description of the legislative history of the 1986 amendment, see *United States ex rel. LaValley v. First Nat. Bank of Boston,* 707 F.Supp. 1351, 1356–57 (D.Mass. 1988).

gation. In 1943, Congress determined to bring this practice to a halt by revising the *qui tam* provisions to exclude suits based on evidence or information already in the possession of the United States. Though not an explicit exclusion of government employees as *qui tam* relators, the language of the 1943 revision plainly had this effect. Some four decades later, in 1986, Congress again revised the *qui tam* provisions, this time in response to a perception that fraud against the government was increasing and too often undetected and unprosecuted. Thus, the 1986 revisions expanded the class of *qui tam* relators by abolishing the 1943 blanket exclusion based on evidence or information in the government's possession, employing instead four specific and limited exclusions. Again, as in 1943, there is no explicit reference to government employees. But in striking contrast to the 1943 revision, the 1986 revision does not have the effect of a blanket exclusion of all government employees. On the contrary, the 1943 language barring *qui tam* suits by government employees was deleted. As the Supreme Court noted in *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 300–301, 78 L.Ed.2d 17 (1983), when Congress includes a limitation in an early version of a bill and deletes it prior to enactment, the limitation is no longer part of the Act. Here, analogously, when Congress includes limiting language in a previous version of a statute and subsequently deletes it, the previously existing limitation is no longer part of the statute.[23]

Finally, this Court must look to Congressional purpose in deciding whether government employees should be allowed to be relators. *See United Hospital Center v. Richardson*, 757 F.2d 1445 (4th Cir.1985); *see also U.S. Army Engineer Center v. Federal Labor Relations Authority*, 762 F.2d 409 (4th Cir.1985). Here, that purpose

could not be clearer: Encourage more *qui tam* suits by expanding the universe of potential relators. Consistent with that purpose, this Court concludes that the current *qui tam* statute permits government employees to sue as relators and that Erickson is not precluded from doing so by any exclusion because he is an original source for information disclosed during a government investigation.

## C. *Effect of Pre-existing Qui Tam Action*

■ The *qui tam* statute bars suits based on facts contained in a previously filed *qui tam* action. It provides, in pertinent part, that:

> [w]hen a person brings an action under [the *qui tam* statute], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

31 U.S.C. § 3730(b)(5). Simply put, this provision establishes a first in time rule.[24] The *qui tam* complaint filed first blocks subsequent *qui tam* suits based on the same underlying facts. In so doing, the statute prevents a double recovery. A subsequently filed *qui tam* suit may continue only to the extent that it is (a) based on facts different from those alleged in the prior suit and (b) gives rise to separate and distinct recovery by the government.

Here, the *qui tam* counterclaim by AIBS against Espinal antedated Erickson's action. This prior counterclaim is, in part, "based on the facts underlying" Erickson's suit. *See* 31 U.S.C. § 3730(b)(5). Specifically, the AIBS counterclaim alleges that Espinal submitted false claims for non-allowable compensation in the form of "bonus" or "supplemental" payments to himself and other INS employees with damages totalling approximately $147,000. Erickson, in his complaint, also alleges that AIBS made improper payments of salaries

**23.** The Justice Department in its *amicus* brief argues that Congress did not realize that by changing the statutory language it might allow *qui tam* suits by government employees. This argument must be rejected. It violates the accepted rule of statutory construction that Congress is assumed to act with deliberation, rather than by inadvertence. *United States v. Motamedi*, 767 F.2d 1403 (9th Cir.1985); *see also*

*United States v. Austin*, 614 F.Supp. 1208 (D.N.M.1985) (in amending statute, Congress is presumed to know law, including construction given to statute prior to amendment).

**24.** Not presented here is the question of how a Rule 15, Fed.R.Civ.P., amendment would affect the application of this provision.

and bonuses to INS employees. Thus, this portion of Erickson's claim is plainly precluded. But the Court is unable to say on the current record whether other portions of Erickson's *qui tam* complaint are barred by the prior AIBS *qui tam* counterclaim. In particular, Erickson alleges that checks payable to INS were diverted to numbered Swiss bank accounts. At this time, it is unclear whether this allegation relies on the facts underlying AIBS' counterclaim. On the other hand, certain portions of Erickson's suit clearly would not be blocked by AIBS complaint. For example, Erickson alleges that AIBS employees used government funds to pay for AIBS employees' personal entertainment. This claim does not involve AIBS' relationship with INS, would not lead to a double recovery by the government and, therefore, would not be barred by the *qui tam* statute.

### CONCLUSION

Erickson's failure to observe the statute's mandatory filing and service requirements compels dismissal of this action.[25] Because this issue was dispositive, the Court could have limited its consideration accordingly. Instead, the Court chose also to address the additional two questions in the event the first issue is successfully appealed. As to the remaining questions, the Court rejects AIBS' and the government's argument that the current statute includes a blanket exclusion of government employees as *qui tam* relators. The statute's structure, history and purpose refute this. It appears, moreover, that Erickson is an original source. Had the service and filing requirements been met, therefore, there would have been no statutory bar to Erickson's *qui tam* action insofar as it is based on facts different from those in AIBS' prior *qui tam* counterclaim.

An appropriate Order will issue.

---

**25.** Section 3730(b) states that "[t]he action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." That provision assumes the existence of a validly brought action. It has no application where, as here, the court concludes the action was not validly brought.