**UNITED STATES of America ex rel. Gilbert E. WINDSOR, Jr., Plaintiff,**

v.

**DYNCORP, INC., et al., Defendants.**

**Civ. A. No. 94–1605–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 9, 1995.

---

Quentin R. Corrie, Anderson & Corrie, Fairfax, VA, Candace S. McCall, Candace McCall, P.C., Fairfax, VA, David P. Towey, Adam Augustine Carter, Towey & Associates, Washington, DC, for Gilbert E. Windsor, Jr.

Howard V. Sinclair, R. Steven Holt, Arent Fox Kintner Plotkin & Kahn, Washington, DC (Dawn E. Oakley, Associate Group Counsel, Dyncorp, Reston, VA, of counsel), for Dyncorp, Fred Clarke, Scott Wood, Richard Riordan, William Gage, Daniel R. Bannister, Paul V. Lombardi and Carl H. McNair.

## MEMORANDUM OPINION

ELLIS, District Judge.

Relator Gilbert Windsor brought this *qui tam* action against DynCorp, Inc. and various of its officers and employees (collectively, "DynCorp") for alleged violations of the False Claims Act ("FCA").[1] Principally at issue is the somewhat unusual question whether alleged violations by DynCorp of the Davis–Bacon Act's[2] reporting and classification requirements constitute "false claims" within the meaning of the FCA. Also at issue is whether Windsor's remaining, more conventional FCA claims are vulnerable to summary judgment on the basis of the existing factual record.

---

1. 31 U.S.C. § 3729–33.

2. 40 U.S.C. § 276a.

### I.[3]

In 1989, the Department of the Army ("Army") entered into a five-year, fixed-price contract with a company named Becon Services, Inc. ("Becon") to have general repair, preventive maintenance, and construction services performed at its Ft. Belvoir, Virginia military base. In 1991, DynCorp acquired Becon and assumed its responsibilities under the contract. These responsibilities included, among others, performing routine preventive maintenance tasks on certain buildings and equipment identified in the contract, as well as responding to individual job orders submitted by the Army on an as-needed basis.

DynCorp hired Windsor in 1992 to be the electric shop foreman at Fort Belvoir. In this capacity, Windsor supervised workers who performed general electric and utilities work at the base. Over the course of his employment with DynCorp, Windsor became concerned that the company was not complying with certain wage and reporting requirements of the Davis–Bacon Act. He also believed that DynCorp was charging the Army for preventive maintenance services that were required under the contract, but that it was in fact not performing. He voiced these concerns to DynCorp's upper-management in late March 1993, but was dissatisfied by their response. DynCorp, it appears, was equally dissatisfied with Windsor. A month later, DynCorp fired him for "insubordination". The following July, Windsor brought this *qui tam* suit. The government investigated his claims, but chose not to intervene,[4] and subsequently awarded a "follow on" contract to DynCorp. Pursuant to 31 U.S.C. § 3730(b)(2)(A), Windsor proceeded to prosecute this action on his own.

The Complaint contains three counts. In Count One, Windsor claims that DynCorp falsely asserted to the government that it was paying wages in compliance with the Davis–Bacon Act, when in fact it was violating the Act's reporting and wage requirements. In Count Two, he alleges that DynCorp fraudulently billed the government for preventive maintenance services that were never actually performed. And in Count Three, he claims that DynCorp failed to perform certain quality control measures that were required under the contract. Defendants seek summary judgment on all three counts.

### II.

■ As an initial matter, DynCorp urges that summary judgment is appropriate because Windsor repeatedly violated the statutorily-mandated *qui tam* seal while it was in effect. *See* 31 U.S.C. § 3730(b)(2). Specifically, DynCorp contends that Windsor disclosed the allegations underlying this *qui tam* suit to at least three individuals while the matter was under seal and before the government had decided whether to intervene.[5] For his part, Windsor denies under oath that he disclosed the allegations of the suit to anyone other than his lawyers while the seal was in effect.

■ The FCA requires a relator to file his *qui tam* complaint *in camera* and under seal, as well as to refrain from serving the defendant until so ordered by the court. 31 U.S.C. § 3730(b)(2). The seal remains in effect for at least 60 days, during which time the government may investigate the claim and make an informed decision whether to take control of the litigation. *Id.* These

---

**3.** Because this matter is before the Court on summary judgment, Windsor's version of the facts must be presented "wherever the parties' evidence conflicts, at least to the degree that [his] allegations have support in affidavits, depositions, or other documentary evidence." *Paroline v. Unisys Corp.*, 879 F.2d 100, 102–03 (4th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)), *vacated and remanded in part en banc on other grounds*, 900 F.2d 27 (4th Cir. 1990).

**4.** The government settled certain other, undisclosed matters with DynCorp and declined to intervene in this suit.

**5.** In support of this assertion, DynCorp submitted affidavits by (1) Don Wehr, a Quality Control Inspector at DynCorp; (2) Billy Colley, an employee of a DynCorp subcontractor; and (3) Ron Gaskell, a mechanic employed by DynCorp. All three affiants state that Windsor related details of the *qui tam* complaint to them well before December 8, 1994, the date on which the seal was lifted.

procedures reflect Congress' desire to permit the government to investigate the allegations without "tipping off" the alleged wrongdoers, while also protecting the defendants from damaging reputational injuries associated with possibly baseless public accusations. *Erickson v. American Institute of Bio. Sciences,* 716 F.Supp. 908, 912 (E.D.Va.1989). To ensure effectuation of these goals, compliance with the FCA's filing and service requirements is mandatory. *Id.* at 911; *X Corp. v. Doe,* 805 F.Supp. 1298, 1301 n. 3 (E.D.Va.1992).

*Erickson* held that dismissal was the appropriate remedy for failure to comply with the FCA's procedural requirements where the relator not only neglected to file the *qui tam* complaint *in camera* and under seal, but also immediately served the defendant with a copy of the complaint. 716 F.Supp. at 911. As that opinion notes, no cure or remedy existed for the filing and service errors there in issue, and hence, dismissal was proper. *Id.* at 912. DynCorp contends that Windsor's breach of the seal similarly warrants dismissal of this action. Windsor, on the other hand, argues that even assuming, *arguendo,* that he disclosed some information about the suit to certain individuals, dismissal is inappropriate since no publicity resulted, and the government's investigation was not obstructed.

▮ The short answer to this dispute is that there is a material issue of fact concerning whether Windsor actually disclosed the contents of the *qui tam* complaint to third parties prior to the lifting of the seal. Also disputed, apparently, is the identity of those to whom disclosures may have been made, as well as the substance of the alleged disclosures. In short, whether disclosures occurred, and if so, whether they warrant dismissal of this case are matters that require further factual development. To be sure, not every technical or minor, remediable violation of the seal requires automatic dismissal of a *qui tam* action. Consider, for example, a relator who makes a single disclosure regarding merely the existence of the *qui tam* action to a spouse or other disinterested party. In that event, circumstances may not justify the harsh remedy of dismissal. On the other hand, where, as here, the relator is alleged to have made improper disclosures to the defendant's own employees, the severity of the dismissal remedy may well be warranted. But because genuine issues of fact remain disputed, summary judgment on this issue is inappropriate.

### III.

Because the seal issue is not now ripe for disposition, analysis appropriately focuses next on whether the individual counts, beginning with Count One, survive summary judgment. In Count One, Windsor makes two claims: He claims that DynCorp violated the Davis–Bacon Act by (1) failing to submit timely payroll reports to the Army, and (2) misclassifying workers in certain instances, thereby underpaying them.

▮ The contract between DynCorp and the Army called for a portion of the work to be done under the Davis–Bacon Act, 40 U.S.C. § 276a.[6] The Davis–Bacon Act is a protective labor law that, among other things, requires certain federal government contracts "for construction, alteration, and/or repair ... of public buildings or public works of the United States" to contain a provision "stating the minimum wages to be paid various classes of laborers and mechanics." *Id.* Pursuant to corresponding regulations issued by the Department of Labor, the contracting government agency, prior to entering into a given contract, makes an initial determination regarding whether the contract is subject to the Davis–Bacon Act. *See Universi-*

---

**6.** Most of the work performed under the contract did not fall under the Davis–Bacon Act, but under another wage law, the Service Contract Act. 41 U.S.C. § 351. The Davis–Bacon Act applied to work classified in the contract as "Level III" and required somewhat higher wages for employees performing such work, while the Service Contract Act applied to contractually classified "Level II" jobs. From the evidence in the record, it appears that DynCorp's workers performed a mixture of Level II and Level III work under the contract, although the majority was Level II work. Because of this, DynCorp's employees at Ft. Belvoir were entitled to different hourly wages depending upon the specific task performed, which often changed several times within a given day or week.

*ties Research Ass'n v. Coutu,* 450 U.S. 754, 760, 101 S.Ct. 1451, 1456, 67 L.Ed.2d 662 (1981). If the contract is determined to be subject to the Act's provisions, then the agency, through its contracting officer, must determine the appropriate minimum wage for each of the various classes of mechanics and laborers predicted to be needed for the contract. 29 C.F.R. § 5.5. Those minimum wages must be based upon wage rates determined by the Secretary of Labor, 40 U.S.C. § 276a, and "[t]he correctness of the Secretary's wage rate determination is not subject to judicial review." *Coutu,* 450 U.S. at 761 n. 10, 101 S.Ct. at 1457 n. 10. The contracting agency's determination of minimum wages is then included in the request for contract bids. After opportunity for administrative review of the contracting agency's minimum wage and classification determinations, this data is ultimately incorporated into the contract.

In addition to the requirement that a contractor subject to the Davis–Bacon Act pay the specified wages, Department of Labor regulations require the contractor to maintain payroll records containing "the name, address, and social security number of each [ ] worker, his or her correct classification, hourly rates of wages paid . . ., daily and weekly number of hours worked, deductions made and actual wages paid." 29 C.F.R. § 5.5(a)(3)(i). The contractor must also submit copies of these payroll records on a weekly basis to the contracting agency, 29 C.F.R. § 5.5(a)(3)(ii)(A), along with a statement certifying that the payroll information is correct and complete and that the workers have been paid "not less than the applicable wage rates . . . for the classification of work performed." 29 C.F.R. § 5.5(a)(3)(ii)(B). Regulations further provide that falsification of the certifications may subject the contractor to liability under the False Claims Act. 29 C.F.R. § 5.5(a)(3)(ii)(D).

As noted, the contract between DynCorp and the Army contained a Davis–Bacon Act wage rate provision, subjecting DynCorp to the Act's wage and reporting requirements. And it is clear from the record that DynCorp did not submit the requisite certified payroll reports for Davis–Bacon Act work from 1991 to 1993, and the reports it ultimately submitted to the Army in 1994 were untimely.[7] Moreover, while there is no dispute that DynCorp's records accurately reflect the wages actually paid its workers, Windsor has presented evidence by way of expert affidavit that DynCorp in certain instances misclassified workers, and the wages paid were therefore legally deficient. For instance, having reviewed DynCorp's records, Windsor's expert concludes that at times, DynCorp's employees were classified as "Laborers", where under Department of Labor policy regarding the work they were performing, they should have been placed into one of the many subclasses for skilled mechanics, such as "Electrician" or "Carpenter". *See infra* note 14. So classified, these employees would have been entitled to higher wages from DynCorp. The question here presented is whether these violations of the Davis–Bacon Act, when coupled with DynCorp's continued request for, and acceptance of, full contract payments by the Army, constitute false claims against the government within the meaning of the False Claims Act.

■■■ Congress enacted the FCA to protect government funds and property from fraudulent claims. *Rainwater v. United States,* 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). In this regard, the FCA imposes liability on any person who "knowingly presents" to the government a "false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (Supp.1995), or who "knowingly makes . . . a false record" in order to have "a false or fraudulent claim paid or approved by the [g]overnment." 31 U.S.C. § 3729(a)(2).[8] The statute defines a "claim" to be "any request or demand . . . for money or property" where the government provides any portion of the money or property requested. 31 U.S.C. § 3729(c). But, as

---

**7.** While admitting that it failed to send the weekly reports to the Army from 1991 to 1993, DynCorp contends that it maintained appropriate records in its own files that were always available for Army inspection.

**8.** The statute also imposes liability in other circumstances that are not relevant here.

these provisions make clear, not every false statement made to a government entity constitutes a "false claim" under the Act. *United States v. Board of Educ. of City of Union City*, 697 F.Supp. 167, 174 (D.N.J.1988) (citing *United States v. Greenberg*, 237 F.Supp. 439, 442 (S.D.N.Y.1965)). Rather, the claim must be one *"for payment or approval"*. As a result, only (i) "actions which have the purpose and effect of causing the government to pay out money" where it is not due, *Union City*, 697 F.Supp. at 175 (quoting *United States v. Lawson*, 522 F.Supp. 746, 750 (D.N.J.1981)), or (ii) actions which intentionally deprive the government of money it is lawfully owed, *United States v. Douglas*, 626 F.Supp. 621 (E.D.Va.1985), are considered "claims" within the meaning of the FCA. Measured against these principles, Windsor's first claim falls short.

 Windsor first contends that DynCorp violated the FCA by failing to submit, or submitting on an untimely basis, the payroll documentation required under the Davis–Bacon Act. But DynCorp's delinquency in submitting certified copies of its payroll reports, though violative of the Davis–Bacon Act and subject to the Act's prescribed penalties, plainly does not constitute a false claim under the FCA. There is simply no falsity, no misrepresentation, in a contractor's failure to submit required payroll reports or to do so in a timely fashion. The government was surely aware that it was not receiving weekly payroll reports from Dyn-Corp, and it could have taken steps in accordance with the Davis–Bacon Act to enforce compliance. Moreover, a contractor's failure to submit payroll reports, in and of itself, causes no economic loss to the government and is not a "claim" within the meaning of the FCA. To illustrate this point, consider, for example, a situation where the workers were paid properly, but DynCorp failed to submit the required documentation. In that event, there would certainly be no false claim for payment, despite the reporting violation. This example demonstrates that the mere failure to submit required payroll reports,

without more, does not subject the delinquent contractor to FCA liability. There is simply no logical nexus between the failure to submit reports, by itself, and economic injury to the government.

 The more significant question is whether Windsor's contention that DynCorp intentionally misclassified, and thereby underpaid, certain workers, combined with DynCorp's continued billing of the Army for the full contract price (which incorporated Davis–Bacon wage rates), states a claim under the FCA. To be sure, where a contractor intentionally misrepresents to the government how much a worker was actually paid, or overstates the number of hours he or she actually worked, the contractor has made a false statement to the government. So, too, has the contractor that purposefully doctors its records to misclassify an employee as a "General Laborer", when in fact it knows that the employee performed work of a more highly paid "Semi–Skilled Laborer". Similarly, a statement by a contractor that it is paying its workers Davis–Bacon Act wages, when it knows that it is not, is false. But this does not end the inquiry, for as noted earlier, not every false statement to the government constitutes a "false claim" under the FCA. *Union City*, 697 F.Supp. at 174. Rather, the putative false statement must have the purpose and effect of "causing financial loss to the [g]overnment." [9]

 Whether a contractor's intentional false statement regarding its payment of Davis–Bacon Act wages constitutes a "claim" under the FCA, then, depends, therefore, on the nature of the underlying contract between the contractor and the government, and more particularly on whether the amount of the government's payments under the contract is in some sense tied, or related, to the amount the contractor pays its workers. The clearest example in this regard would be a contract pursuant to which the amount the government paid the contractor for project work was a multiple of the contractor's actual

9. *Douglas*, 626 F.Supp. at 628 (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968)). *See also Smith v. United States*, 287 F.2d 299, 304 (5th Cir.1961) (FCA applies where as a result of fraudulent statement, "expenses [are] ultimately borne by the United States Treasury").

labor costs. In that event, the misrepresentation of actual labor costs would result directly in an overpayment by the government. The contract in the case at bar, however, was a "fixed price" contract, meaning that the parties calculated a contract price by estimating in advance the cost of the project, based on a composite Davis–Bacon Act wage rate. DynCorp then billed the government based on that pre-determined, fixed price. Yet, despite the more attenuated connection between actual labor costs and contract price in this case, there would nonetheless be a loss to the government if DynCorp intentionally paid its workers lower wages than were due by misclassifying them. This is so because in calculating its bid for the contract, DynCorp was required by the government to use a composite Davis–Bacon Act wage rate. In short, as with all Davis–Bacon Act contracts, the government paid more for the contract in order that the workers would be paid more. Thus, if Windsor's allegations of intentional misclassification are true, the government was deprived of a benefit of its bargain and was, in that sense, overcharged.[10]

▮ Despite this, summary judgment for DynCorp is nonetheless appropriate on this issue, for it is impossible to determine whether DynCorp submitted a false claim to the government without first determining whether DynCorp actually misclassified an employee in a given instance. And, the responsibility for resolving such disputes rests not with the courts, but with the Department of Labor. A cursory review of the governing regulations makes this allocation of responsibility quite clear. Under labor regulations, the contracting agency is responsible for investigating a contractor's compliance with the Davis–Bacon Act by performing confidential interviews with employees and examining payroll data. 29 C.F.R. § 5.6(a)(3). And, in inspecting the payroll documents, the contracting agency is directed to take "particular care ... to determine the correctness of classifications and to determine whether there is a disproportionate employment of laborers and of apprentices or trainees."[11] *Id.* Upon a recommendation by the contracting agency, or on its own initiative, the Department of Labor may choose to conduct a further investigation, following which it will issue findings. 29 C.F.R. § 5.6(b).

Importantly, the regulations provide that disputes over the proper classification of workers *must* be resolved according to the regulatory procedures set forth. 29 C.F.R. §§ 5.11(a), 5.5(a)(9). *See also Coutu,* 450 U.S. at 761, 101 S.Ct. at 1457 (stating that "[d]isputes over the proper classification of workers under a contract containing Davis–Bacon provisions must be referred to the Secretary for determination"). Specifically, a contractor disputing the Department of Labor's investigatory findings may request a hearing in front of an Administrative Law Judge. 29 C.F.R. § 5.11(b)(2). The regulations then provide detailed rules of practice to govern such hearings. 29 C.F.R. § 6.1–6.41. In sum, a Davis–Bacon Act worker classification dispute, by itself, is not an FCA claim because such disputes must be resolved by the Department of Labor.

No court, it seems, has directly confronted and decided this issue. Analogous authority, though scant, supports the general conclusion that Davis–Bacon Act classification disputes must be referred to the Department of Labor for resolution.[12] A moment's reflec-

---

10. DynCorp urges that despite this, no economic loss resulted to the government in this case since the composite wage rate used in calculating its bid turned out to be substantially the same as the composite wage rate actually paid its employees. Thus, on a larger scale, DynCorp argues, it did not "cheat" the government out of any resources. At worst, according to DynCorp, certain workers were overpaid, while others were underpaid. It is unlikely that this sort of "rough justice" would avoid liability under the FCA, which focuses on individual claims for payment. In any event, the disposition of this case on other grounds renders it unnecessary to consider this argument.

11. Laborers, apprentices and trainees are classes falling on the low end of the wage-rate scale.

12. *See Davis v. Hardaway Contr. Co.,* 239 Ark. 1, 386 S.W.2d 707 (1965) (Davis–Bacon Act dispute regarding whether workers were properly classified as mechanics or as mechanics' helpers, greaser-oilers, agitators, and transit mix operators must be referred to Secretary of Labor for determination). *Cf. Carabetta Enters. v. Harris,* 24 Wage & Hour Cas. (BNA) 398, 1979 WL 1907 (D.D.C.1979) (Department of Labor's resolution of classification dispute is not subject to judicial review). In addition, in describing the negotia-

tion explains why this must be so. To permit Windsor's claim to go to a jury would result in bypassing the carefully crafted administrative scheme for resolving Davis–Bacon Act classification disputes. Contrary to this scheme, a jury, not the agency, would listen to testimony of employees regarding the work they performed on various dates and then determine the appropriate classification for any given task by reference to the Department of Labor's complex classification standards. That both parties have retained experts to assist the jury in this undertaking further underscores the wisdom in requiring classification disputes to be resolved in the administrative arena.[13]

■ The conclusion reached here, that the Department of Labor has sole responsibility for resolving classification disputes under the Davis–Bacon Act, in no way suggests that violators of the Davis–Bacon Act enjoy blanket immunity from FCA liability. They do not. Where the contractor's statement may be determined to be false without regard to complex Davis–Bacon Act classification regulations, then a Davis–Bacon Act violation may form the basis of an FCA suit.[14] That is, where the "falsity" of the false statement is not dependent on interpretation and application of those regulations, the current obstacle to FCA liability disappears. For example, if, unlike the instant situation, a contractor misrepresents the wages actually paid to its employees, or lies about the frequency with which they receive paychecks, an FCA action may be viable. *See United States v. Greenberg*, 237 F.Supp. 439 (S.D.N.Y.1965) (where it was undisputed "that the wages certified to in [the Davis–

tion process between contractor and government agency leading up to the award of a contract, the Supreme Court noted that "[d]isputes over the proper classification of workers under a contract containing Davis–Bacon provisions must be referred to the Secretary [of Labor] for determination." *Coutu*, 450 U.S. at 761, 101 S.Ct. at 1457. However, it left open the question whether such classification determinations may be subject to judicial review. *Id.* at 767–69, 101 S.Ct. at 1459–60. It is also worth noting that the Eighth Circuit recently considered a *qui tam* action where the relator claimed that a Davis–Bacon Act contractor submitted false payroll reports to the government, and part of the fraud included misclassification of workers. *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699 (8th Cir.1995). But the Court did not address or even raise the question presented here and disposed of the case on the ground that the relator was not an original source. *Id.* at 703–04.

13. Windsor's expert's affidavit reflects the complexity of the rules governing the proper classification of Davis–Bacon Act workers and confirms the wisdom of committing classification disputes to the agency. For example, in explaining how DynCorp misclassified workers in one circumstance, he states:

> [I]n most cases where DynCorp employees were listed on weekly certified payroll reports in service employee classifications that have no readily identifiable counterpart in the applicable wage determination issued by the Department of Labor pursuant to the Davis–Bacon Act, [a DynCorp representative] testified that he assumed that such employees were properly classified for Davis–Bacon purposes as "Laborers".... In most instances this is incorrect because the appropriate wage and fringe benefits to which a misclassified DynCorp employee

is entitled are those listed for one or more classifications of skilled mechanics, *i.e.*, an Electrician or Carpenter, not for the "Laborer" classification. This is because the Department of Labor has adopted a policy that, where the wage and fringe benefits applicable to a particular classification of laborer or mechanic determined to "prevail" in a locality correspond with a wage and fringe benefit package negotiated by a local building trades union that represents workers in that classification, that union's practices regarding assignment of work are also recognized as the "prevailing area practice." *Fry Brothers, Inc.*, WAB Case No. 76–6 (June 4, 1977). As a result, if a local union whose negotiated wage and fringe benefits have been determined by the Department of Labor to be "prevailing" in the locality pursuant to the Davis–Bacon Act, classifies every worker who handles the "tools of the trade" as a mechanic, regardless of his or her level of skill, so too must employees covered by a Davis–Bacon wage determination that reflects such wages and fringe benefits must also be paid the "prevailing" wage and fringe benefits applicable to skilled classifications regardless of his or her skill level. Thus, it was inappropriate to classify DynCorp employees as "Laborers" and compensate them in accordance with the wage and fringe benefits set forth in the applicable Davis–Bacon wage determination for the "Laborer" classification if such worker performed the duties recognized by a labor union that negotiated the wage and fringe benefits recognized as "prevailing" for a classification of skilled mechanics."
> (Yellig Aff. at 16).

14. Of course, all of the elements of an FCA claim must still be satisfied. *See supra* note 9 and accompanying text.

Bacon Act payroll] reports were higher than the wages actually paid," contractor was liable under FCA).[15] In that circumstance, the jury could make a finding regarding the falsity of the false claim through standard fact finding techniques, and with no intrusion into the province of the Department of Labor. Accordingly, the Davis–Bacon Act by no means precludes or preempts all FCA suits for false claims that happen also to be Davis–Bacon Act violations.[16] It is worth emphasizing in this regard that Windsor claims not that DynCorp misrepresented the amount its workers were actually paid, but rather that its classification of certain workers was erroneous. Such disputes are appropriately relegated to the Department of Labor.

## IV.

◼ The contract between the Army and DynCorp required DynCorp to perform preventive maintenance services, such as routine utility and plumbing work, on certain, specified buildings and equipment at the Ft. Belvoir base. In Count Two of his *qui tam* complaint, Windsor claims that though many of these preventive maintenance services were never performed or completed, Dyn-Corp continued to bill the government the full monthly contract price. While DynCorp concedes this to be true, it has nonetheless offered substantial, unrefuted evidence that negates any FCA claim.

The record evidence shows that over time, the Ft. Belvoir contract, which was originally entered into by Becon and subsequently acquired by DynCorp, became outdated and did not accurately correspond to existing conditions at the base. From 1991 to 1994, major renovations were undertaken at Ft. Belvoir; a number of buildings were demol-

ished, while new ones were constructed. Thus, it was impossible for DynCorp to provide some of the services required under the contract (*e.g.*, providing preventive maintenance services on a building no longer in existence). At the same time, new services not provided for in the contract had to be performed (*e.g.*, servicing a newly constructed building). Yet the contract's rigid billing provisions did not accommodate these changed circumstances. Under the contract, DynCorp was required to submit monthly invoices to the Army for $\frac{1}{12}$ of the fixed yearly contract price for preventive maintenance services.

The evidence shows that the Army was fully aware of these deficiencies in the contract. In an effort to devise temporary solutions to these problems while contract modifications were being considered, the Army's Contracting Officer's Representative, Kenneth McLain, worked closely with Fred Clarke, DynCorp's manager in charge of preventive maintenance at Ft. Belvoir. Significantly, DynCorp submitted an uncontradicted declaration by McLain in which he describes these deficiencies in the contract and the problems they raised. Following this description, he explains that after conferring with the Administrative Contracting Officer, DynCorp and the Army

> arrived at a mutually agreed strategy to do the best we could to overcome the Contract deficiencies, while working within the guidelines of the Contract's performance work statement, keeping track of what we could to sort things out later in a settlement.

(McLain Decl. at ¶ 11).

McLain explains that the contract required DynCorp to continue to bill the full monthly

---

**15.** Thus, *Greenberg*, unlike the case at bar, did not require an initial determination regarding whether the defendant complied with the requirements of the Davis–Bacon Act and its accompanying regulations. In other words, the contractor reported that a worker was paid $X an hour, when in fact the worker received less than $X an hour. This statement is false regardless of the Davis–Bacon Act's classification rules and regulations, and given the acknowledged harm to the government, 237 F.Supp. at 442–43, was properly deemed a false claim under the FCA.

**16.** Indeed, the regulations themselves support this conclusion. *See* 29 C.F.R. § 5.5(a)(3)(ii)(D). (providing that falsification of payroll certifications may subject contractor to FCA liability). However, while § 5.5(a)(3)(ii)(D) clearly anticipates that some false statements made on payroll reports "may" be considered false claims under the FCA, it does not purport to make all such statements so.

contract price, regardless of the work actually performed.[17] As a result, McLain states that the Army

> followed a procedure by which we could track DynCorp's performance and deduct from the Contract price for any work not performed. . . .
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> DynCorp provided written reports to me each month of the [preventive maintenance] tasks that were performed. From these reports, I could determine what [preventive maintenance] tasks were performed, and which ones were not performed. When [preventive maintenance] tasks which should have been performed had not been performed, the government reduced its payment to DynCorp based on the value of services received.

(McLain Decl. at ¶¶ 12, 14).[18] The Army and DynCorp held ongoing settlement negotiations regarding the value of these services. As McLain's declaration makes clear, while the government received a monthly invoice for ½ of the fixed contract price for preventive maintenance. This was appropriate because the contract called for such an invoice. But the government did not pay this amount. It adjusted the payment based on reports from DynCorp regarding the work actually performed and subsequent negotiations regarding price. Windsor offers no evidence to contradict McLain's description of the preventive maintenance billing arrangement that DynCorp and the Army reached. Nor does

Windsor show that DynCorp falsified any reports listing the work actually performed. Thus, this case presents the somewhat unusual circumstance where a contractor's submission of an invoice covering work not actually performed does not constitute a false claim. The Army was fully cognizant of the billing situation, and DynCorp and the Army were entitled to develop practical measures to respond to the unusual and unanticipated contract administration problems that arose as a result of changed circumstances.

Of course, if DynCorp had submitted false monthly reports to McLain claiming credit for preventive maintenance work not actually performed, then it might well be liable for making false claims. In an effort to resist summary judgment, Windsor argues that DynCorp did not always alert the Army when preventive maintenance tasks went unperformed, thereby misleading the government. The weakness in this argument, however, lies in the uncontested evidence from McLain that pursuant to the mutually agreed-upon billing arrangement with DynCorp, the Army only paid for services that DynCorp affirmatively included in its monthly reports; any preventive maintenance task called for under the contract but not included in DynCorp's monthly reports was presumed not to have been completed.[19] This is not fraud. Windsor simply has failed to produce any evidence pointing to a specific instance where DynCorp misled the government regarding the work it performed.[20] Therefore,

---

17. McLain states in this regard:

> The Contract required DynCorp to send monthly invoices with fixed amounts of billings for [preventive maintenance] tasks. There was no mechanism in the Contract for DynCorp to provide an automatic reduction for [preventive maintenance tasks] not performed, and there were no breakdowns of cost by individual [preventive maintenance] tasks; thus an appropriate credit or addition to the Contract price could not be unilaterally calculated.

(McLain Decl. at ¶ 12).

18. DynCorp has also submitted the affidavit of Fred Clarke, the DynCorp employee who principally negotiated with McLain. Clarke's affidavit corroborates McLain's sworn statements.

19. Indeed, Windsor's own evidence supports this fact. Charles Brummett, the Chief of Quality Assurance for the Army, states in an affidavit submitted by Windsor that "if DynCorp did not

deliver the required Recurring/Preventive Maintenance Completion Reports, it was provided for under the contract that the preventive maintenance work was assumed not to have been performed by DynCorp." (Brummett Aff. at ¶ 4).

20. Windsor makes certain broad allegations that are simply not supported by the record evidence. For instance, in one of his memoranda, Windsor states:

> O'Leary [(a DynCorp computer manager)] stated that he canceled the [preventive maintenance] work orders if they were not turned in, and that the canceled work orders showed up on the management reports as "completed." Ex. 20 at 18–21. In addition, the unfinished and actually canceled work orders were also entered into the computer as "completed".

(Mem. in Opp. to Mot. for S.J., at 50). However, the referenced pages of O'Leary's deposition sup-

 

summary judgment must be granted on Count Two.

### V.

■ In Count Three, Windsor claims that Defendants defrauded the government by failing to perform "quality control" on the preventive maintenance services it performed. Specifically, Windsor claims that DynCorp failed to perform random sampling and inspections of its preventive maintenance services. DynCorp moves for summary judgment, noting that while the relevant contract modifications *required* DynCorp to perform quality control on *all* individual job orders, there was no set requirement for inspections of routine preventive maintenance tasks. In support of this proposition, DynCorp submitted the contract language itself, which provides that "[t]he Contractor shall provide inspection and coordination services for all delivery orders," but contains no similar requirement for preventive maintenance.

In addition, it appears from Clarke's affidavit and McLain's declaration that the negotiations regarding quality control focused on the need for 100% inspection of individual job orders. Inspection of preventive maintenance work was considered a secondary priority, to be completed with whatever resources remained after ensuring complete quality control of the individual job orders. In his uncontradicted declaration, McLain describes the negotiations in the following terms:

> In negotiations with Mr. Clarke about modifications for increasing quality controls and stiffening performance standards, Mr. Clarke and I discussed the possibility that high workloads for mandatory inspections could result in a shortage of quality control inspectors to inspect [preventive maintenance] tasks, a situation that had occurred during performance by Dyn-Corp's predecessor, B[econ]. I stated that the [contract] modifications were intended to alleviate this possible situation by stat-

ing that mandatory inspections must be done and giving DynCorp the responsibility to adjust its resources as necessary to perform other inspections to meet the intent of the modification to provide quality work.

(McLain Decl. at ¶ 17). Thus, it is evident that there was no fixed percentage or number of inspections required on preventive maintenance tasks. And while the government expected high quality work in all respects, the degree to which DynCorp performed quality control on preventive maintenance services was fairly flexible.

For his part, Windsor has provided no specific evidence regarding the contractual requirements for random samplings, nor has he detailed the manner in which DynCorp allegedly fell short of the requirements. Similarly, he has submitted no evidence that DynCorp misled the government into believing that it had performed quality control in a given instance, when in fact it had not. Instead, Windsor appears to make the general argument that because DynCorp did not perform all of the preventive maintenance work required under the contract, *see supra* § IV, it similarly could not have performed the requisite quality control. Given the disposition of Windsor's preventive maintenance FCA claim, this argument is unavailing. Because there is no evidence to support a conclusion that DynCorp made a false claim to the government concerning quality control measures on preventive maintenance work, summary judgment must also be granted on Count Three.

### VI.

For the foregoing reasons, DynCorp's motion for summary judgment is granted on all counts.

---

port just the opposite conclusion. (He describes alternately using the words "canceled" and "unfinished" to describe work not performed). Windsor later cites additional pages of O'Leary's

deposition testimony, but he has not included these pages in the material submitted to the Court. They are, therefore, not in the record.