**CUBIC APPLICATIONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Logicon RDA, Intervenor.**

No. 97–29C.

United States Court of Federal Claims.

Feb. 25, 1997 *.

* This opinion was originally issued and filed under seal on February 20, 1997. The opinion is being released for publication on this date with redaction of certain information that the parties

deemed to be proprietary. The court did not redact all of the material requested by the parties because some of the requested material was not, in the court's view, "proprietary" information.

All redactions in this opinion are denoted by a double asterisk (* *).

James J. McCullough, Washington, DC, for plaintiff.

E. Michael Chiaparas, Department of Justice, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director, all of Washington, DC, for defendant. Major Daniel K. Poling and Thomas J. Duffy, United States Army Legal Services Agency, Arlington, VA, of counsel.

Michael A. Gordon, Rockville, MD, for intervenor.

## OPINION

BRUGGINK, Judge.

This bid protest case is presently before the court on the parties' cross-motions for summary judgment on all counts of the complaint. Oral argument on Count I was heard on February 3, 1997. Oral argument on Counts II, III, and IV was heard on February 14, 1997. For the reasons set forth herein, plaintiff's motion for summary judgment is denied and the Government's motion for summary judgment is granted.

### Background

On April 24, 1996, the United States Department of the Army ("Army") formally issued Solicitation DAJA22–95–R–0083. The solicitation sought bids from contractors to "conduct computer driven battle simulation exercises" for the Battle Simulation Centers of the 7th Army Training Command, located in the Army's European Command. The "Scope of Work" clause in the solicitation provides that the work is to include:

> operation of simulation facilities; training of exercise controllers and observer controllers; input and maintenance of exercise data; continuous computer system coverage during configuration of hardware software simulation exercises; conducting command post exercises for contingency operations using simulation models in an

analytical environment; participation in and conducting after action reviews of exercises . . .; and, exploitation of new developments in simulation technology.

Plaintiff, Cubic Applications, Inc. ("Cubic"), and intervenor, Logicon RDA ("Logicon"), are the only two firms that bid on the contract. The resulting contract is a follow-on contract for these same battle simulation exercise services, which have been continuously performed since 1990 under two previous contracts.[1] The contract itself is to be a requirements contract with cost-plus-award-fee task orders for one year, with options for three additional years. The Army's acquisition plan states that the total expected cost over the four year period will approach $82.3 million.

The Army set forth the procedures it would follow for procuring the needed services in the Source Selection Plan (SSP). The SSP provided that a Source Selection Authority (SSA) would approve the release of the solicitation and would make the final award decision by utilizing "all evaluation reports, summaries, scores and analyses to determine the offeror whose proposal offers the best value to the Government." The SSA was to be advised by the Source Selection Advisory Council (SSAC) which, in turn, was to review the analyses of the Source Selection Evaluation Board (SSEB) and the Cost Realism Report prepared by the Contracting Officer (CO). The SSEB was charged with evaluating the technical and management factors, while the CO, with assistance from the Financial Services Office (FSO) and the Defense Contracting Audit Agency (DCAA), was to evaluate the offeror's cost proposals. In addition, the CO was to prepare an analysis of the past performance factor based on questionnaires sent to other agencies for whom the bidder had performed similar contracts.

Under the terms of the solicitation, offers are to be evaluated on the basis of four factors and their respective subfactors:

1) Technical Factors:
 (a) Staffing
 (b) Operational Organization
 (c) Qualifications and Training of Proposed Personnel
 (d) Simulation Knowledge and Experience
 (e) Quality Control Plan
2) Management Factors:
 (a) Contract Management
 (b) Mobilization Plan
 (c) Contract Experience
 (d) Personnel Management
 (e) Demobilization Plan
3) Past Performance Factors:
 (a) Quality of Services
 (b) Cost Control
 (c) Timeliness of Performance
 (d) Customer Satisfaction
4) Cost Factors

The solicitation further provided that the "technical [factor] is more important than management which, in turn, is more important than past performance. Technical, management and past performance together are significantly more important than cost." "Significantly more important" is defined by the solicitation as being at least twice as important. Thus, cost was not a primary determinate. Indeed, Logicon's costs, after "normalization by the FSO," were estimated to be approximately * * * million more than those of Cubic. However, Logicon scored higher than Cubic in all technical and management subfactors (except for contract experience, on which both offerors received perfect scores), and each offeror received an equal score on the past performance factor.

Following the competitive bid process, on September 16, 1996, the Army awarded Contract DAJA22–96–D–0069 to Logicon.[2] Cubic, the incumbent contractor, then filed a protest before the General Accounting Office (GAO) pursuant to 31 U.S.C. § 3551–3556 (1994). As a result of the GAO protest,

---

1. Logicon was the initial contractor under the 1990 award. In 1993, Cubic was awarded the contract and replaced Logicon. On each of these prior occasions, Logicon and Cubic were the only firms that bid on the contract.

2. The bid process consisted of initial offers, agency discussions with both offerors, and the submission of Best and Final Offers.

Cubic's contract, which was set to expire in October 1996, was extended to a new expiration date of February 28, 1997. On January 2, 1997, the GAO issued its decision denying Cubic's protest. At that point, Logicon began the start-up and transition phase of its contract with the Army. However, on January 15, 1997, Cubic filed its present protest action in this court. The court held a hearing on January 16, 1997, to consider Cubic's application for a temporary restraining order, which was denied. *See* Order of January 17, 1997. The court agreed to hear the cross-motions for summary judgment under an expedited schedule in view of the Government's interest in maintaining uninterrupted access to training services for soldiers in Europe, and because of the approaching expiration of Cubic's current contract on February 28, 1997.

## Discussion

An unsuccessful bidder on a federal procurement contract may challenge the contracting agency's actions in the United States Court of Federal Claims. *See* 28 U.S.C. § 1491(b) (1994), *as amended by* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, 3874–74 (1996). Prior to this recent amendment, post-award bid protest actions were only reviewable by the federal district courts under the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1994). Under the amended version of the statute, this court must also apply the standards set out by the APA in reviewing the agency's award decision. *See Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339 (1997).

In Count I of its complaint, Cubic complains of a defect in the solicitation and the resulting contract that was not brought to the attention of either the agency or the GAO. Cubic alleges that the services anticipated by the Army in the solicitation are "advisory and assistance services" under 10 U.S.C. 2304b (1994). If that is true, Cubic argues, then, as a matter of law, both the solicitation and the resulting contract are void *ab initio* because the Army failed to

provide for multiple awards in the solicitation and did not make any written determination, as required by statute, that the services anticipated by the solicitation are "unique or highly specialized, [such that] it is not practicable to award more than one contract." *Id.* § 2304b(e)(2)–(3). Count II alleges that in awarding the contract, the Government failed to properly assess and evaluate the technical risks associated with the intervenor's proposed compensation plan, and the Government improperly "normalized" the proposed costs of the bidders. Count III alleges that the Government improperly scored the plaintiff's bid on the "Contract Management" subfactor. Count IV alleges that the Government improperly assigned an equal score to both plaintiff's and intervenor's bids on the "Past Performance" evaluation factor, and also alleges that the Government failed to properly consider a "substantial disadvantage" related to staffing in the intervenor's bid. Each of the four counts are addressed below.

■ A procedural motion first must be addressed. The Government seeks to put additional materials before the court in its motion to supplement the record. The material consists of the affidavit of Mary E. Clary, a CO with the Army's Mission Contracting Activity, Fort Leavenworth, Kansas. Ms. Clary states she was the CO on the procurement that prompted the protest, and ultimately the GAO decision, in *Nations, Inc.,* B–272455, 96–2 CPD ¶ 170 (Nov. 5, 1996). That procurement involved services for the "technical preparation ... and assistance in executing" "'event driven' computer simulation services employing scenarios that realistically model the capabilities of the Army, allied forces and selected opposing forces." *Id.* In other words, it was very similar to the current procurement. In her statement, Ms. Clary recites that a copy of Nations' protest was sent to all prospective offerors in that solicitation, which included Cubic. The protest was sent to Cubic on July 9, 1996. Plaintiff opposes inclusion of the materials because they offer nothing "'new' or particularly relevant."

■ As explained in the opinion of January 29, 1997, the primary focus of the court's

review should be the materials that were before the agency when it made its final decision. *Cubic,* 37 Fed.Cl. at 343. This is a presumption necessitated by the limited nature of the court's inquiry. As a practical matter, however, in most bid protests, the "administrative record" is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review. This is true in the contract award context if for no other reason than that, due to the absence of a formal record, the agency has to exercise some judgment in furnishing the court with the relevant documents. In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery, aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action. It follows that discovery as well as the breadth of the court's review has to be tailored in each case. Whether testimony is needed to frame the issues is likewise dependent on the particular circumstances. Consequently, this court has adopted a flexible approach both in putting together the evidence that will be considered and in discovery, balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as the four corners of the inquiry.

One reason the court declined to permit all of the discovery requested previously by the plaintiff is that much of the refinement of the relevant agency materials had occurred at the GAO. Plaintiff was able to obtain any documents it needed to pursue the issues raised there. *See* 4 C.F.R. § 21–3(f) (1996). No suggestion has been made that additional document discovery is needed as to those issues. Similarly, plaintiff passed up the opportunity to request a hearing on the Count

II–IV issues before the GAO. *See id.* § 21.7. In part for that reason, extensive depositions were not permitted here.

Discovery was allowed to plaintiff with respect to Count I, however. The issue raised there—whether the solicitation is void due to failure to comply with section 2304b—was not considered at the GAO because Cubic did not raise it. The court permitted the Government, in pursuing its argument that the facts do not warrant a multiple award, to submit an after-the-fact determination and finding by the CO. The court permitted discovery by plaintiff directed at this determination and has permitted it to file the deposition of the CO. At a separate argument as to Count I, the CO was present and the court asked the parties if they wished her to testify. Both declined to call her and rested on her deposition.

The Government's alternative argument as to Count I is that the plaintiff waived this issue by not timely asserting it prior to bringing this action. In support of this latter argument, the Government now wants to submit supporting evidence in the form of an affidavit and attachments. Although the court does not view the waiver issue in the same way as does the Government, this is precisely the type of occasion in which the court should normally permit evidence beyond that known to be in front of the agency decision makers.

The court is persuaded that the materials are relevant for the reasons discussed below in connection with Count I. They will therefore be considered. During the February 14, 1996 argument, plaintiff was offered the opportunity to offer a counter-affidavit but elected not to do so, presumably because its factual assertions are not, as it states, "new."

*Count I*

The Federal Acquisition Streamlining Act of 1994 (FASA) instituted new reforms for the procurement of task and delivery order contracts by the Government.[3] *See* 10

---

**3.** A "task order" contract is a contract for "services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the *performance of tasks* during the period of the contract." 10 U.S.C.

§ 2304d(1). A delivery order contract is one "for property that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity) and that provides for the issuance or orders for the delivery of property during the period of the contract." *Id.*

U.S.C. §§ 2304a–2304d (1994). Among these reforms was the addition of a preference for multiple awards under a single solicitation for task order contracts for advisory and assistance services. *See* 10 U.S.C. § 2304b. FASA, in relevant part, provides:

(e) Multiple Awards.—(1) The head of an agency may, on the basis of one solicitation, award separate task order contracts under this section for the same or similar services to two or more sources if the solicitation states that the head of the agency has the option to do so.

(2) If, in the case of a task order contract for advisory and assistance services to be entered into under this section, the contract period is to exceed three years and the contract amount is estimated to exceed $10,000,000 (including all options), the solicitation shall—

(A) provide for the multiple award authorized under paragraph (1); and

(B) include a statement that the head of the agency may also elect to award only one task order contract if the head of the agency determines in writing that only one of the offerors is capable of providing the services required at the level of quality required.

(3) Paragraph (2) does not apply in the case of a solicitation for which the head of the agency concerned determines in writing that, because the services required under the task order contract are unique or highly specialized, it is not practicable to award more than one contract.

*Id.*

 Here, the contract, including all options, was to exceed three years and the contract amount was estimated to exceed $10,000,000. If the contract at issue is indeed for advisory and assistance services, then initially it is squarely within paragraph (2). There is no question that the solicitation provided for the award of only one contract, and that the requirements of section 2304b(e)(2) were not met. However, even if the contract anticipates the provision of advisory and assistance services, paragraph (3) of section 2304b(e) provides an alternative to

§ 2304d(2). The parties do not dispute that the

offering multiple awards in a single solicitation by allowing a single award where the agency determines that the services required are so unique or highly specialized that it is impracticable to make multiple awards. Here, the Army claims to have satisfied this requirement with a Determination and Finding (D & F) issued by the CO.

A D & F was not made in this solicitation until after the award to Logicon. Indeed, it was made after and because of this protest, on January 23, 1997, by the CO, Ms. Kelly Stratton–Feix. She recites that when the Request for Proposals (RFP) was issued on April 24, 1996, she was of the opinion that section 2304b did not apply because the services, although they were sought on a task order basis, were not "advisory and assistance" services. She maintains that view. Nevertheless she determined, based on several findings, that only one contractor could reasonably be expected to perform the work. In shortened form, she made the following findings:

1) Because of the ... [United States Army European Command (USAREUR)] mission and its relationship to this contract, tasks likely to be ordered are so integrally related that only one contractor can reasonably perform the work:

a) The USAREUR requirement for battle simulation support services consists of the operation of nine battle simulation centers located throughout Europe and the support of simulation exercises for training soldiers within USAREUR.

\* \* \* \* \* \*

b) When USAREUR deployed a Corps to Southwest Asia in 1990, contractor personnel from the predecessor battle simulation contract took computer equipment to Southwest Asia and trained those troops using databases reflecting actual conditions there to perfect the method ultimately used to successfully attack the Iraqi army.

\* \* \* \* \* \*

c) .... To split this effort among two or more contractors would disrupt the

contract at issue here is of a task order type.

continuous training cycle, create confusion, preclude synergism, and inevitably result in a serious degradation of USAREUR's ability to respond to new operational requirements. The nature of this requirement in an ... [outside the continental United States (OCONUS)] environment simply does not lend itself to severable taskings to multiple contractors.

2. Because the contract is to be performed OCONUS, it is physically impracticable to have more than one contractor perform the USAREUR requirement: Unlike work in performed under similar contracts in the United States, all work (except for infrequent off-site exercise support) under this contract is performed in Government facilities, i.e., USAREUR's nine battle simulation centers. These centers have neither sufficient space nor equipment to accommodate more than one contractor.

&ast; &ast; &ast; &ast; &ast; &ast;

3. Because the contract is to be performed OCONUS, it is financially prohibitive to have more than one contractor perform the USAREUR requirement [due to the expense of providing logistical support to contracted employees.]

&ast; &ast; &ast; &ast; &ast; &ast;

Plaintiff deposed Ms. Stratton–Feix. The deposition reveals a CO who is remarkably limited in her ability to explain the D & F. At the outset, then, the plaintiff urges the court to treat the D & F as insufficient under the statute. The court declines to do so. On the face of it, the D & F is compelling as a justification for not making multiple awards for this solicitation. It is the court's view that the test for the sufficiency of the document should be the same at this point in the solicitation as it would have been if a prospective bidder had challenged the procurement shortly after the RFP was issued. Cubic, or some other potential bidder, could have inquired whether the statutory determination had been made and presumably would have obtained a D & F equivalent in substance to the present one. If a challenge had ensued on the ground that the D & F was inadequate to avoid the presumption of multi-

ple awards, the court would test it pursuant to APA standards. Did it appear arbitrary or capricious? Was it developed in accordance with law?

Because the determination appears regular and provides a thoughtful and rational basis for limiting the award to a single contractor, the court would not be inclined to permit inquiry behind that facial regularity. Due to the unusual circumstances under which the D & F came into existence in this case, however, the court permitted discovery. What is now known is that the CO is poorly equipped to defend the determination. She could add little to what is stated in the D & F because she placed great reliance on the advice of others. The process of deferring to advice from others is not *per se* arbitrary, however, and the result is certainly not capricious. The court has no difficulty comprehending that having two task order contractors immediately available in Europe on a cost-plus contract to provide highly complex services could result in significant inefficiencies or conflicts. That is sufficient.

Section 2304b states that the "head of an agency" must make the written determination that multiple awards are not practicable. In this case, that decision was made by the CO. However, the CO is delegated that authority under the applicable regulations, *see* Federal Acquisition Regulation (FAR) 16.503(d)(1), and had an adequate warrant.

In short, the D & F persuades the court that, if it had been in existence prior to the solicitation, Count I would be groundless. There would be no legal basis to challenge the agency's determination that only one award is practicable. The real issue is whether the fact that the determination was made after award voids both the award and the solicitation.

█ Some preliminary defenses must be addressed. The Government and Logicon contend that the record demonstrates Cubic knowingly elected not to pursue the contention that the solicitation was void *ab initio*. The court agrees that, given Ms. Clary's statement, it is not inappropriate to assume that Cubic was well aware in July 1996 of the *Nations* protest. This was after the solicita-

tion here but prior to award. Cubic knew, therefore, that one potential offeror on a different contract for similar services took the view that section 2304b applied. If it did, either there would have been a D & F, or the language required by section 2304b(e)(2)(B) should have been included as part of the solicitation. These facts strengthen, in their view, the Government's and Logicon's contention that, by not raising this issue at the GAO in September, 1996, Cubic waived it for all time.

The court agrees that these facts are relevant, but it does not agree that the result is waiver of the grounds for Count I. There are three independent reasons. The first is that, whatever GAO's internal rules concerning assertion of claims, they cannot bind this court. Because this court does not sit in appellate review of GAO decisions, considerations that might otherwise be appropriate to an appellate court do not apply here. Second, the argument made is that the solicitation and subsequent award to Logicon are illegal, void, and unenforceable. In the court's view, that contention is of such moment that it has to be considered, even if it was not raised at the GAO. Bid protesters, contrary to the Government's argument,[4] are not protecting merely their own interests in challenging illegal procurement activity. The public has an interest at stake as well, and the courts have recognized that protesters serve, in some respects, as private attorneys general. Finally, it is not unusual for parties to plead in the alternative, or to pursue remedies seriatim. In the absence of some clear precedent barring invocation of what would otherwise be this court's de novo powers to review the award, the court will consider Count I.

 There is no dispute that a determination under section 2304b(e)(3) was not made pre-award. If one was required under the circumstances, i.e., because the solicitation

was for a task order contract for advisory and assistance services, then the procedures of section 2304b were not followed. The court rejects the Government's contention that, because the section 2304b does not specifically require the D & F to be made prior to the solicitation, it can be made at any time. The applicable regulations state that the determination must be made prior to issuance of the solicitation. *See* FAR 16.504(c)(2)(i)(A). This is the only logical reading of the statutory provision. Section 2304b is the authority for entering into task order contracts for advisory and assistance services in excess of $10,000,000. *See* 10 U.S.C. § 2304b(a). Subsection (e) provides that, in the case of solicitations of that character, the *solicitation* shall provide for multiple award and include a statement warning bidders that, in the event it is determined that only one of the offerors can provide the appropriate level of quality service, only one award will be made. The following sub-subsection (e)(3), at issue here, creates an exception to the need to make the warning statement in the solicitation. The only point at which such a determination could be made in conjunction with the rest of subsection (e) is prior to issuance of the solicitation.

Thus, the initial substantive question is whether the contract at issue here falls within the statutory meaning of "advisory and assistance services." Advisory and assistance services are defined by FASA as those services from nongovernmental sources that provide: "(i) Management and professional support services ...; (ii) [s]tudies, analyses, and evaluations ...; [and] (iii) [e]ngineering and technical services." 31 U.S.C. 1105(g)(2)(A) (1994). Prior to FASA there was no statutory definition of advisory and assistance services. However, there were at least two regulatory definitions of such services in use. *See* FAR 37.201 to 203 (1993); OMB Cir. A–120 (Jan. 4, 1988) (referring to advisory and assistance services as "consult-

---

4. The Government takes the remarkable position that § 2304b cannot form the basis for a challenge by a private contractor. The test it establishes is whether "a private remedy is implicit in the statute." Def.Brief of Feb. 6, 1996, at 16. That same contention could be made about any requirement in the myriad of procurement statutes and regulations that routinely form the backdrop for challenges to solicitations or awards. The question is not whether a private cause of action for a money remedy can be inferred, but whether there is standing, as plainly there is here. If the default result, assuming the statute applies, is multiple awards, then the losing bidder in a solicitation involving only two offerors has an obvious financial stake.

ing services"). The prior FAR definition provided that advisory and assistance services are those "to support or improve agency policy development, decision-making, management, and administration, or to support or improve the operation of management systems." FAR 37.201. "[T]raining which maintains skills necessary for normal operations" was specifically exempted from the services covered. *Id.* at 37.203(c)(3). However, no such exemption is expressly included in either the current form of the statute [5] or its implementing regulations.

The current FAR definition of advisory and assistance services provides that:

*Advisory and assistance services* means those services provided under contract by nongovernmental sources to support or improve: organizational policy development; decision-making; management and administration; program and/or project management and administration; or R & D activities. It can also mean the furnishing of professional advice or assistance rendered to improve the effectiveness of Federal management processes or procedures (including those of an engineering and technical nature). In rendering the foregoing services, outputs may take the form of information, advice, opinions, alternatives, analyses, evaluations, recommendations, training and the day-to-day aid of support personnel needed for the successful performance of ongoing Federal operations. All advisory and assistance services are to be classified in one of the following definitional subdivisions:

(a) Management and professional support services, i.e., contractual services that provide assistance, advice or training for the efficient and effective management and operation of organizations, activities (including management and support services for R & D activities), or systems. These services are normally closely related to the basic responsibilities and mission of the agency originating the requirement for the acquisition of services by contract. Includ-

ed are efforts that support or contribute to improved organization of program management, logistics management, project monitoring and reporting, data collection, budgeting, accounting, performance auditing, and administrative/technical support for conferences and training programs;

(b) Studies, analyses and evaluations, i.e., contracted services that provide organized, analytical assessments/evaluations in support of policy development, decision-making, management, or administration. Included are studies in support of R & D activities. Also included are acquisitions of models, methodologies, and related software supporting studies, analyses or evaluations; or

(c) Engineering and technical services, i.e., contractual services used to support the program office during the acquisition cycle by providing such services as systems engineering and technical direction ... to ensure the effective operation and maintenance of a weapon system or major system....

FAR 37.201.

The Government and Logicon argue strenuously that this solicitation was not one for advisory and assistance services. They first contend that the statutory definition is narrow and limited, and that the regulatory interpretation unnecessarily broadens the meaning of the terms, which were meant only to encompass the prior regulatory definition in the FAR. But as Logicon aptly points out to the court: " 'It is presumed that when Congress drafts a statute, it does so with full knowledge of the existing law and with great care for the precise language which must be used to achieve the desired result.' " Intervenor Brief of Jan. 31, 1997, at 12 (citing *Federal Elec. Corp. v. Dunlop,* 419 F.Supp. 221 (M.D.Fla.1976)). Contrary to the Government's and Logicon's position, here it is the statutory language that is broad and the regulatory language that is more specific. Moreover, Logicon's assertion that

---

**5.** There are three statutory exceptions to the definition of advisory and assistance services, however, none are applicable here. *See* 31 U.S.C. § 1105(g)(B) (exempting "[r]outine automated data processing and telecommunications ser-

vices;" "[a]rchitectural and engineering services, as defined in the Brooks Architect–Engineers Act (40 U.S.C. § 541);" and "[r]esearch on basic mathematics or medical, biological, physical, social, psychological, or other phenomena").

section 2304b's reference to the definition of advisory and assistance services in section 1105(g) specifically refers to the prior FAR definition—and its exemption of training services—is without merit. Section 1105(g) was not enacted until 1994—by the very same Public Law as section 2304b itself. *See* Public Law No. 103–355, §§ 1004(a)(1), 2454(a), 108 Stat. 3251 (1994). Contrary to Logicon's argument on this point, nothing in § 2304b(i) makes reference to an "existing" definition. Rather, 10 U.S.C. § 2304b(i) states only that "the term 'advisory and assistance services' has the meaning given such term in section 1105(g) of title 31."

It may well be the case that it makes no practical sense to include contracts to provide simulation services for the armed forces under the rubric of "advisory and assistance services." However, the elasticity of those terms, as well as those of the applicable regulations make it impossible for there not to be overlap with the equally protean phrasing of the words of the solicitation. Statements in the Government's brief such as, "Simulation services have nothing to do with 'management and operation' of Army units," Def. Brief of Feb. 6, 1997, at 11, are no more than wishful thinking. If the contract at issue in fact has nothing to do with managing and operating Army units, one wonders why it is worth the investment of a substantial amount of public revenue. The difficulty for the Government is that the statute, the regulations, and the statement of work are all equally interlarded with cliched management terms that can change form from verbs to nouns to adjectives with complete ease, leaving behind as little content in one form as another. More to the point, the statute, regulations, and solicitation share such terms.

The court will not further address this issue for two reasons. First, because the GAO opinion in *Nations* comes to the same conclusion on very similar facts. The GAO's interpretation of the statute and applicable regulations is persuasive and is thus entitled to some deference.[6] Second, and more important, it is unnecessary for purposes of this action to hold as a matter of law that plain-

tiff's current position that section 2304b is applicable to these facts is correct. In view of the holding below, even if the statute does apply, the Army's failure to make the determination before award was, from plaintiff's perspective and in the context of a request for equitable relief, harmless error.

From what has been said above, the court will assume that the agency should have treated this solicitation as subject to the requirements of section 2304b prior to release. In the court's view, the real question prompted by the agency's failure to make a timely D & F is whether this failure constitutes a defect of such a nature that the solicitation must be voided from the outset.

Cubic argues that the award to Logicon is void due to a lack of authority in the CO. This is based in part on specific language within section 2304b:

(a) Authority to award.—(1) Subject to the requirements of this section, section 2304c of this title, and other applicable law, the head of an agency may enter into a task order contract ... for procurement of advisory and assistance services.

(2) The head of an agency may enter into a task order contract for procurement of advisory and assistance services only under the authority of this section.

Cubic contends that, because the contract with Logicon was not made pursuant to the procedural requirements set out in section 2304b, it was entered without authority and hence is void *ab initio*.

■ The following language appears in *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed.Cir.1986): "We start with the proposition that the failure of a contracting officer to comply with statutory requirements in making an award renders the contract a nullity." *Id.* at 392 (citing Thomas R. Brous, *Termination for Convenience: A Remedy for the Erroneous Award*, 5 Pub.Cont.L.J. 221, 222–23 (1972)). Fortunately, this statement has to be seen in the larger context of a rule of reason that is applied in this circuit. This court reads the decisions in this area to discourage court nullification of a prior award unless: 1) there is a clear lack of

---

**6.** The Government's attempt to distinguish *Na-* *tions* is groundless.

contracting authority in the relevant individual or agency;[7] 2) there is an absence of a link to an appropriation;[8] 3) or where award or performance of the contract would be plainly illegal.[9]

■ In the court's view, the issue here is not one of lack of authority. As the Government points out, the "authority and responsibility to contract ... are vested in the agency head." FAR 1.601. That authority is then delegated to contracting officers, who "have authority to enter into, administer, or terminate contracts...." FAR 1.602–1(a). The CO here thus had general contracting powers. Moreover, section 2304b, in light of the appropriate delegations, specifically gave her the authority to enter into a task order contract for advisory and assistance services. Whether or not the contract is subject to the statute, she had authority to award a contract for the services at issue. The peculiarity is that she simply did not believe that she needed to invoke the authority created by the statute. While the award to Logicon is thus flawed due to the agency's failure to follow the procedures under the statute, that failure does not mean that the CO lost her underlying delegation of authority. Nor is there any question about the agency's ability to obligate monies for this contract. Hence the contract is not void for lack of appropriated funds.

The Court of Claims decision in *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), is frequently cited for the following:

> In testing the enforceability of an award made by the Government, where a problem of validity of the invitation or the responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit.

163 Ct.Cl. at 386, 325 F.2d at 440. This is a reflection of a principle set out in *United States v. New York & Porto Rico S.S. Co.*, 239 U.S. 88, 93, 36 S.Ct. 41, 42, 60 L.Ed. 161 (1915), by Justice Holmes: "Even when a statute in so many words declares a transaction void for want of certain forms, the party for whose protection the requirement is made often may waive it, 'void' being held to mean only voidable at the party's choice."

■ In the present circumstances, it is clear from the legislative history of section 2304b that a motivating concern of Congress was the belief that greater use of multiple awards for task order contracts would foster competition. *See* S.Rep. No. 103–258, at 15–16 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2575–76. Thus, while bidders have suf-

---

7. *Total Med. Management, Inc. v. United States*, 104 F.3d 1314 (Fed.Cir.1997). Cubic places particular reliance on *CACI, Inc. v. Stone*, 990 F.2d 1233 (Fed.Cir.1993). There, the Federal Circuit overturned a decision on a bid protest by the General Services Administration Board of Contract Appeals ("GSBCA"). The GSBCA had declined to set aside a contract to the intervenor despite the fact that the agency had failed to obtain a prior delegation of procurement authority (DPA) from the General Services Administration ("GSA"). The GSBCA held that this failure could be corrected after the fact, much as the Government argues here that the D & F can be made subsequent to award. The appellate court rejected that argument, however. The applicable regulations required the agency to obtain acquisition-specific DPA's. The relevant statutory authority to contract rested with the GSA Administrator. Without the DPA, there was no authority in the agency to contract. The court ruled that this deficiency could not be corrected *nunc pro tunc*.

8. *See Sutton v. United States*, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); *American Tel. and Tel. Co. v. United States*, 32 Fed.Cl. 672 (1995).

9. In *Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 572 F.2d 727 (1978), the plaintiff contracted to offer fire insurance coverage to certain federally-insured properties. It developed that the company had no charter to sell insurance outside of Alabama, which it had to be able to do to fulfill its contract with the Government. The contract thus purported to pay the insurance company to do something forbidden by law. Performance of the contract would have run a risk of violating the law. *See also Amdahl*, 786 F.2d at 387 (In *Amdahl* the illegality in the contract was seen as undercutting the authority delegated to the agency).

ficient interest in receipt of multiple awards to have standing to enforce the statutory requirements, the court must recognize that the principal interest here is that of the public. It is appropriate, therefore, to ask whether it is in the public interest to insist on adherence to the requirements of section 2304b in ⁺he present circumstances. The court is persuaded for several reasons that it is not.

First, the error is harmless to all parties, including Cubic. Cubic's interest in the correct enforcement of section 2304b is less abstract and lofty than that of the Government. It had an interest only if it could force a multiple award. As explained above, however, the Army made the determination that this must be a single award. There is no reason to think that it would come to a different conclusion if the award were voided and the solicitation reissued. Indeed the original solicitation warned bidders that there would be a single award. Although this was not a determination prompted by the statute, it clearly demonstrates that the Army's current position is not merely one of convenience. The only utility Cubic could derive from voiding the solicitation, in other words, arises not out of adherence to the statute to prompt a multiple award, but because it might reap some advantage in a new competition for a single award. The fairest test of the relative merits of the two competitors, however, comes from an examination of their prior submissions. Permitting Cubic to re-compete in light of what it now knows of its competition's proposal is unfair to Logicon, particularly in light of other considerations, discussed below.

The second reason the court declines to void the award and solicitation is that all the parties, including Cubic, were operating under the impression that section 2304b did not apply to this procurement. The illegality, in other words, was not plain. While the court will assume that the tasks forming the subject of this contract were "advisory and assistance services" for purposes of the statute, the presence of a broad statutory definition and the elimination of training as an exception in the regulations were relatively new. Failing to see the need to consider the stat-

ute, in the absence of the *Nations* precedent, is not surprising.

Nor could Cubic have been deceived into thinking that multiple awards were in the offing. The contract was for more than three years and the amount exceeded $10,-000,000, yet there was no statement as required by section 2304b(e)(2)(B). Although Cubic theoretically could have assumed that the agency had made a determination under section 2304b(e)(3), it did not ask for a copy of the required determination. Moreover, the solicitation specifically stated that a single award would be made. In view of its silence in the face of knowledge of the grounds of the *Nations* protest, the only logical inference is that Cubic, like the Army, assumed that this section was inapplicable to the procurement because the tasks orders would not constitute "advisory and assistance services." The Army, in other words, acted in good faith in exercising its judgment that the solicitation did not implicate the requirements of section 2304b.

Finally, the court believes it is appropriate, in considering the appropriate remedy in an equity proceeding, to take into account Cubic's conduct. As least as early as its knowledge of the grounds of the *Nations* protest, Cubic knew of the contention that section 2304b applied to procurements such as those at bar. It declined to inquire whether the Army had made a D & F. If it were persuaded, as it contends it is today, that the D & F had to be made prior to issuance of the solicitation, by far the most opportune time to make that assertion would have been immediately after the solicitation, and, in any event, prior to award.

The *Nations* case was decided on November 5, 1996, well before the GAO completed its work on Cubic's appeal. Given Ms. Clary's notification to Cubic, it is not inappropriate for the court to assume that Cubic knew about the decision shortly thereafter. When it appealed to the GAO, Cubic got a 100–day extension on its existing contract. As the incumbent contractor, in other words, Cubic received direct benefit from the extension granted by GAO. Only after losing on its effort to be the single awardee did Cubic argue in this court that the solicitation was

void from the outset. In *E. Walters & Co., Inc. v. United States*, 217 Ct.Cl. 254, 264–65, 576 F.2d 362, 366–68 (1978), the court held that the protester waived the right to insist on adherence to certain procedural requirements by knowingly not asserting them at a time when they could have been corrected without prejudice. In the view of this court, the same result should obtain here. Cubic made no effort to assert the illegality of the solicitation during the GAO proceedings, preferring instead to pursue the single award. To obtain equity, Cubic had to do equity, and it did not.

*Count II*

■ In Count II, Cubic complains that Logicon's proposed employee compensation plan was not properly evaluated under the terms of the solicitation. Specifically, Cubic alleges that Logicon's technical ratings, as determined by the SSEB, were not evaluated in view of Logicon's compensation plan, which the FSO and the CO admittedly found to be underestimated. Cubic further alleges that the SSA was not informed of the possible negative impact on Logicon's technical abilities presented by its insufficient compensation package. Lastly, Cubic asserts that it was improper for the Army to "normalize" the costs of both offerors to an estimate of what the Government believed would actually be experienced.

Cubic does not base this count of its protest merely on the fact that Cubic bid a lower estimated cost to the Government. Rather, Cubic contends that the award to Logicon was improper because the SSEB scored the technical factors without considering the possible impact of Logicon's low compensation plan.[10] Specifically, Cubic relies on the finding of the FSO that Logicon would be unable to attract qualified personnel at the level of compensation being proposed. The CO also believed that Logicon's proposed compensation plan was unrealistic. The results of the FSO and CO findings were reported in the Cost Realism Analysis Report to the SSAC.[11] The SSAC was given both the cost information and the SSEB findings on the technical and management factors. The SSAC's report to the SSA indicated that "there are no known major risks associated with the technical requirements" for either offeror. Based upon this information, the SSAC recommended to the SSA that the contract be awarded to Logicon.

As Cubic correctly points out, the solicitation provides that proposed costs must be "credible, realistic and reasonable," and that a "proposal which fails to reflect or which understates the cost of the proposed technical and management plans submitted to meet contract requirements will be evaluated as being, unrealistic, and unreasonable." Although Logicon's compensation proposal was found to be well off the mark, Cubic's costs were also estimated to be inaccurate, only to a lesser degree. Cubic cannot complain that it was unaware that Logicon's, and indeed its own, proposed costs would be adjusted to reflect what the Army thought to be realistic under the circumstances of a cost-plus contract. The solicitation provides that "[e]ach offeror's proposed costs will be adjusted for cost realism, as necessary, to arrive at a probable cost for each offeror which will be used for purposes of comparison." This is exactly what the CO did in the Cost Realism Analysis Report.

The solicitation does not require the SSEB to make an independent evaluation of the cost factors, rather, under the SSP, the SSAC is charged with integrating "the technical evaluation, the past performance data,

---

10. Cubic asserts that this part of Count II is based, in part, on the solicitation's inclusion of FAR 52.222–46. This clause, titled "Evaluation of Compensation for Professional Employees," specifically tasks the Army with evaluating the proposed compensation of professional employees to ensure that such compensation "reflects a sound management approach" and will "provide uninterrupted high-quality work."

11. In the report, the CO noted that:

Both offerors took dramatically different approaches to the benefits package offered to their employees. [Cubic] . . . has provided costs estimates which are considered the more realistic of the two. . . . The bottom line of both offerors illustrates the employee's actual net income after all deductions and adjustments have been made. [Logicon's] . . . approach, if accepted as proposed, poses a greater risk to the government whereby the government would probably experience a contract cost increase of several million dollars.

and the cost realism analysis for each offeror." The SSAC received both the Cost Realism Analysis Report, including the original unadjusted numbers of both Logicon and Cubic, and the technical and management results of the SSEB. It is made up of senior military and civilian personnel. Moreover, the SSAC's report to the SSA indicates the SSAC's full knowledge of the cost normalization procedures applied to Logicon's proposal:

> [E]ach offeror's final proposed costs were adjusted based on a cost realism assessment conducted by the ... [CO] and her contract price analyst, with input by the ... [DCAA].
>
> \* \* \* \* \* \*
>
> The costs realism assessment "normalized" (equalized) a number of cost elements due to the inability of the KO [ (CO) ] and the contract price analyst to ascertain rationale for significant differences in offerors' proposed costs for staffing, labor escalation, travel, other direct costs, demobilization, and individual logistic support costs. Logicon's proposed costs for those elements were "normalized" to the higher ... [Cubic] proposed amounts because ... [Cubic], the incumbent contractor currently experiencing the costs, proposed costs deemed more realistic. There was no significant rationale to support Logicon's proposed lower costs, although it is possible that Logicon's proposed efficiencies outlined above may result in lower actual contract costs as well as savings to the Government in time and manpower.

There is no question from the record that the SSAC, and subsequently the SSA, were well aware of the deficiencies in Logicon's proposed employee compensation plan, yet neither associated this as a risk to Logicon's technical ability.

Cubic's chief complaint here is that Logicon will not be able to attract a sufficient workforce to meet its technical proposals. However, the contract at issue is a cost reimbursement contract. It was not irrational for the SSAC to assume that a contractor in this position would hire qualified personnel. Cubic points out that Logicon, in its BAFO, refused to increase its employee compensa-

tion proposal after being informed of the Army's discomfort with the proposal on this factor. However, both Cubic and Logicon were aware that their proposed BAFO costs would be normalized for comparison purposes. This normalization of the proposed compensation costs suggests that the Army intended to pay the costs necessary to maintain a sufficient workforce, regardless of which contractor prevailed.

The court is satisfied that the SSAC made an informed and reasoned determination that there was no major risk to technical ability as a result of Logicon's deficiency. In addition, the court is satisfied that the SSA was aware of the discrepancies in the proposed compensation plans of the offerors. In view of the facts that the solicitation warned bidders of cost normalization, that the SSAC simultaneously considered both the technical and cost scoring, and that this is a cost-plus contract, the court cannot say that the Army's procedural treatment of this matter was arbitrary or that the decision not to downgrade Logicon's technical scores was capricious.

*Count III*

█ In Count III, Cubic alleges that the Army improperly evaluated Cubic's score under the contract management subfactor of the management evaluation factor. Specifically, Cubic asserts that it was improper to award a low score in this area based only upon the alleged personal knowledge and experience of individual members of the SSEB, where no notice of any deficiency was given to Cubic in its pre-BAFO discussions with the Army. Cubic contends that there is no support in the record for the low score it received.

The SSEB consisted of five individuals who each independently scored the offerors on every subfactor in the technical and management evaluation factors in both the initial offers and the BAFOs. In its brief, Cubic implies that its low score in the contract management subfactor was based, primarily, on the score, and notes, of Steve Warner, one of the SSEB members. In his work evaluation sheets of the BAFO, Mr. Warner gave Cubic a score of \* \* out of a possible \* \*

points, which equates to * * percent of the total available points.[12] In his accompanying notes, Mr. Warner states that the Government has been unable to retrieve needed information from Cubic through the "in-place" cost management system being utilized on the incumbent contract. Cubic maintains that, as a matter of law, such personal knowledge and experience cannot stand independently as a basis for lowering Cubic's score in this area. Rather, Cubic argues, there must be adequate support for this statement in the record.

The Government responds that during the pre-BAFO discussions, the Army specifically requested that Cubic provide more information on its proposed cost management system. The Government's position is supported by the record. In a July 9, 1996 letter, the CO expressly notified Cubic of the "deficiencies and weaknesses" to be addressed at a pre-BAFO discussion. Included as a "weakness" under the contract management subfactor was the following:

(1) Proposal provides a basic description the [sic] capabilities of the cost management system; however, no detail of its interrelationships is given on which an evaluation of its feasibility, efficiency, and timeliness in relation to contract performance could be based.

(2) Proposal lacks detail on procedures to forecast and notify the Government of situations where costs threaten to exceed the baseline funding. The Performance Management Baseline Schedule implies that any variance to the cost management system is immediately assessed and, if necessary, immediate corrective action is taken, but this does not detail the management/Government contacts or working of the cost management system.

(3) Offeror did not acknowledge the requirement to sign for all Government–Furnished Property.

(4) Offeror proposed using a proprietary software package ... to support VISION XXI. If access to the software will be overly restricted, the Government will have to use other software to support the After–Action Review process.

Cubic maintains that the CO's letter merely identified a request by the Army for more "detail" on the cost management system, and did not indicate any problems with the in-place system. However, the letter to Cubic from the CO specifically characterized this need for detail as a "weakness" in Cubic's proposal. Cubic, in other words, had adequate notice, before the BAFO, that the Government was concerned about its cost management system and expected the matter to be addressed in Cubic's BAFO. Subsequently, in its report to the SSAC, the SSEB noted that Cubic "failed to demonstrate [the] adequacy of its automated cost management system" in the BAFO, and that "there was minimal information provided on [t]his automated management system." The SSEB's report stated that it "was not convinced that the ... interface was a viable, functioning system." Thus, it is evident from the record that the SSEB found Cubic's BAFO responses to the identified "weaknesses" to be inadequate. The court is not in a position to second guess that assessment.

Moreover, as the Government points out, prior to the submission of its BAFO, Cubic made no specific expression of its intent to utilize the in-place system for the proposed follow-on contract. The SSEB's Evaluation Worksheet Narrative noted that: "During the discussions that preceded the BAFO, ... [Cubic] demonstrated an automated system that they represented as the CM/CPMST interface. That system was described by ... [Cubic] as being under development." Only in its BAFO did Cubic unambiguously express that the cost management system "is in place today and will be used in the new contract at no additional cost to the Government."

Mr. Warner's, and other SSEB members', comments thus have to be viewed in context. They were prompted by Cubic's BAFO reference to its current-contract method of cost

12. However, Mr. Warner's grade to Cubic on this subfactor was not the lowest given by the various board members. For example, in his evaluation worksheet, Lieutenant Colonel Lloyd Lietz gave Cubic a score of only * * out of * * points ( * * %). Only one board member gave Cubic a higher score in this subfactor than Mr. Warner, the other three gave lower scores.

management. Under that circumstance, there is no error in a committee member giving his candid views of the quality of that method. Because the existing contract was not under review, there was no need to notify Cubic of his concerns.

The court finds that there is ample evidence in the record to support the SSEB's decision to lower Cubic's score in the contract management subfactor. The court cannot say that a final consensus score of * * by the SSEB was arbitrary or capricious under these circumstances.

*Count IV*

In Count IV, Cubic makes two distinct arguments. First, Cubic argues that it was improper for the CO to give both offerors the same score on the past performance evaluation factor. Second, it asserts that the SSA was not made aware of a "substantial disadvantage" in Logicon's proposal, and thus could not have made a fully informed award decision. The court will address the latter claim first.

Cubic contends that the SSA was never informed of Logicon's proposed method of supporting a specific exercise (known as TACSIM) with a * *. Cubic points out that this methodology was identified by the SSEB as a "substantial disadvantage," and asserts that it should have been specifically referenced to the SSA, but was not.

Under the SSP, which the SSA approved prior to the release of the solicitation, percentage scores in the various evaluation factors were given specific meanings. Under the SSP, a score of 95–100% "[d]emonstrates the ability to fully satisfy the stated requirements and meet all objectives with few or no disadvantages[.]" A score of 85–94% "[d]emonstrates the ability to fully satisfy the stated requirements but with substantial disadvantages[.]" Logicon received a score of 94% on the staffing subfactor of the technical evaluation factor. The SSEB gave a presentation to the SSAC in which a graphic clearly depicted the staffing subfactor score of Logicon as 94%—indicating that substantial disadvantages existed in its proposal. Moreover, this particular graphic expressly indicated that Logicon's proposal to support TACSIM with * * was a substantial disadvantage. The

SSEB report to the SSAC also contained substantially this same information.

The SSP provides that the SSA "shall utilize all evaluation reports, summaries, scores and analyses to determine the offeror whose proposal offers the best value to the Government. . . ." If the SSA did what he was required to do, as the court is entitled to assume absent some other knowledge, he would have seen the raw scores on the subfactors. The 94% score on Logicon's staffing subfactor would have been expressly indicative of a substantial disadvantage in this area. The SSAC report, moreover, was accompanied by an oral presentation. All that is before the court is an outline of that briefing. In short, it is highly unlikely that the SSA was unaware of the disadvantage in Logicon's proposal.

■ However, even if the court assumes the SSA was unaware that Logicon received a score of 94% on this subfactor, there is no reason to think this omission was prejudicial. Logicon's score of 94% in the staffing subfactor was its only subfactor score lower than 95%, and Logicon's overall scores for the technical and management evaluation factors were above the 95% level. Cubic received scores below the 95% level in four of the subfactor categories, and received overall scores below the 95% level in both the technical and management evaluation factors. Specifically, Cubic's score in the staffing subfactor was only 82%. Under the SSP, a score of 75–84% "demonstrates the ability to meet objectives but lacks clearly defined approaches to how requirements criteria will be satisfied and contains such significant disadvantages that there is some question whether offeror can fully meet the stated requirements[.]" It is highly unlikely that the SSA would have made a different decision with the subfactor scores because Cubic's score on the same subfactor was much lower, and in a lower classification category. Thus, even assuming that the SSA did not have the subfactor scores before him, a court finding that this was prejudicial would be unsupported.

Cubic's final complaint under Count IV is that the CO improperly assigned equal scores to both offerors under the past perfor-

mance evaluation factor. The solicitation required both offerors to submit lists of all contracts with the Government that were completed in the past three years. From these lists, the CO selected twelve Cubic contracts, ten Logicon contracts, and three from DynCorp (Logicon's proposed subcontractor) for past performance review.[13] Cubic first complains that Logicon failed to include a specific contract of DynCorp on the list submitted in the initial proposal. Cubic asserts that this contract would have negatively affected Logicon's score on the evaluation factor.

■ The omitted contract was between DynCorp and the Department of the Army, and became the subject of *qui tam* litigation. *See United States ex rel. Windsor v. Dyn-Corp, Inc.*, 895 F.Supp. 844 (E.D.Va.1995). The contract was a five year fixed price contract on which performance began in 1989. *Id.* at 847. Thus it was within the three-year period contemplated by the solicitation in this case. The court finds that Logicon should have reported this subcontractor contract to the Government in its initial proposal. Having failed to do so, the court must determine whether such an omission was prejudicial to the review process and Cubic.

Cubic asserts that the litigation involved in this unreported contract would have adversely affected the past performance score given to Logicon. In *DynCorp*, a former employee of DynCorp brought a *qui tam* lawsuit against the company alleging violations of the False Claims Act. *Id.* The Government investigated the claims but declined to intervene in the action. In fact, the Government proceeded to award a follow-on contract to DynCorp. *Id.* The court found no evidence of the submission of false claims and granted summary judgment to the contractor on all counts. *Id.* at 855. The reported result of the litigation thus weighs against Cubic's argument here. If anything, the award of a follow-on contract after the initiation of the *qui tam* suit suggests the Government's confidence in and satisfaction with the contrac-

tor. Logicon erred by not reporting this contract to the Government, but the court finds the omission to be harmless.

Cubic also asserts that the CO improperly assigned equal past performance scores given the negative comments made about Logicon by certain reviewers. Logicon correctly points out that the comments cited by Cubic neglect to include the many positive comments also made by the very same reviewers cited. Although Logicon received more negative comments than Cubic, it also received many more positive comments than Cubic. After reviewing the record, the court cannot say that the CO's decision to award equal scores on the past performance evaluation factor was arbitrary and capricious. This is especially true in view of the CO's knowledge that both Cubic and Logicon had satisfactorily performed these same services at the same location for the Army in the past.

### Conclusion

For the reasons stated above, no grounds exist for enjoining the award. Cubic's motion for summary judgment is denied on all counts. The Government's and Logicon's motions for summary judgment are granted on all counts. The Clerk is ordered to dismiss the complaint. No costs.

---

**13.** The CO's review was conducted in the form of multiple choice questionnaires that were sent to the selected reviewers. The CO sought to obtain past performance review on contracts similar to the one proposed in the solicitation.